# NORRIS *v.* HAGGIN.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE DISTRICT OF CALIFORNIA.

No. 333.　Submitted May 2, 1890. — Decided May 19, 1890.

A plaintiff who delays for fifteen years after an alleged fraud comes to his
knowledge before seeking relief in equity is guilty of laches, and his bill
should be dismissed.

IN EQUITY.　The defendants demurred to the bill and it was
dismissed.　The plaintiff appealed.　The case is stated in the
opinion.

*Mr. J. H. McKune* for appellant.

*Mr. Louis T. Haggin* and *Mr. S. C. Denson* for appellees.

MR. JUSTICE MILLER delivered the opinion of the court.

This is an appeal from the Circuit Court of the United
States for the District of California.　The plaintiff, Samuel
Norris, who is appellant here, brought his suit in the Superior
Court of the county of Sacramento, against James B. Hag-
gin and Lloyd Tevis, by way of a bill in chancery.　The bill
gives a very lengthy account of what the plaintiff calls a
"fraud and imposition" practised upon him by the defend-
ants, who had been his agents and attorneys, and who, when
he became so enfeebled in mind as to be incapable of under-
standing his rights or attending to business at all, procured
from him conveyances and mortgages and other instruments
in writing, by means of which they secured the title to over
a million and a half dollars' worth of property, principally
real estate.

This suit was commenced on the 21st day of August, 1884,.
and after a demurrer by defendants had been filed in the state

court, it was, on their motion, removed into the Circuit Court of the United States for the District of California. There the case was heard on the demurrer, which was sustained by the Circuit Court and the bill dismissed. 28 Fed. Rep. 275. From the decree dismissing the bill, the present appeal is brought.

The statements of the bill are very full and profuse in their recital of the advantages taken by the defendants of the plaintiff. He sets out in the amended bill, which was filed in the Circuit Court, that he was a citizen of the kingdom of Denmark, and a resident of the Sandwich Islands. That from the 1st day of December, 1849, until the 2d day of April, 1861, he was the owner in fee, in possession and entitled to the possession, of a certain piece or tract of land consisting of 45,000 acres, in the county of Sacramento, on the right bank of the American River, and known as the Rancho del Paso, and more particularly described in a patent from the government of the United States to him, which was duly recorded in the office of the recorder of Sacramento County. That also he was the owner of certain other parcels and lots of ground, the value of which in the aggregate amounted to $1,535,000. He then says that on or about the 1st day of January, 1855, said Haggin and Tevis became and, until a short time prior to the commencement of this suit were, the trusted agents, business managers and attorneys of plaintiff in and about the management of his business affairs connected with said property; that the defendants, for a valuable consideration, promised and undertook to act as his agents and confidential advisers, and that, having faith and confidence in their integrity and ability, he, from said first day of January, 1855, to the last of December, 1867, trusted them, and took and acted on their advice in all his business affairs, and counselled with them in all matters of importance, and confided to them all matters pertaining to his affairs. He then states that on the 4th day of March, 1859, he was injured by a severe blow on his head, whereby his senses and faculties were impaired, so that he then and thereby became deaf, and that for several months his hearing was wholly gone, and his left eye became and for several

years was sightless. That his nervous system was so far injured by said blow that for several years thereafter he was unable to take refreshing sleep, and for more than ten years thereafter he was unable, and mentally and physically incompetent, to attend in person to his business affairs or comprehend or understand what had been done in or about his said business, or to direct his agents how to act, therein.

The specific acts of fraud charged to have been committed against him by the defendants are, mainly, that on the 29th day of April, in the year 1859, while in this unfortunate condition, they procured from him a note for $64,000, with a mortgage upon all his property to secure its payment; that this note was without consideration; that he did not understand it; that it was never read to him; and that, also, without his knowledge, they brought suit and foreclosed the mortgage by a decree of court, under which they purchased it at the sale, and now have the legal title; also, that they procured other judgments to be rendered against him in favor of other parties, on alleged contracts of which he had no knowledge or recollection, and in which, also, certain of this property was sold and purchased, and came ultimately to the hands of defendants Haggin and Tevis, all of which was through their contrivance. It is further alleged that, in order to make sure of their claim to this property, they procured from defendant on the 23d day of June, 1863, a conveyance, executed and delivered by him to said Tevis, of all the estate hereinbefore described, and also all other lands owned by him in California, which deed was recorded in the proper office on the 10th day of September, 1863.

The bill also alleges that these frauds did not come to his knowledge until a short time before the commencement of this suit, and then only through information derived from his counsel in the case.

There are many things about the bill which are peculiar and calculated to throw suspicion on the claims here asserted. The original bill filed in the state court was afterwards supplemented by two amended bills in the Circuit Court of the United States. The allegations of these bills are, in the main

the same; but there are some differences in them which are calculated to attract attention. Among these are the fact that in the first amended bill filed in the Circuit Court of the United States, the execution of the note and mortgage for $64,000 is thus described: "That on the 29th day of April, 1859, your orator became indebted to said defendant Tevis in the sum of $64,000, and on that date gave said Tevis his note due on demand, for that sum, for the benefit of both defendants, and to secure said note, and on the same date, executed and delivered to said Tevis, for the benefit of both defendants, his certain indenture of mortgage securing the payment of said note by pledge of all the real estate herein-before mentioned; that on the 12th day of January, 1860, said Tevis commenced his suit to foreclose said mortgage in the District Court of the 6th Judicial District; that your orator, if he had at said time been able and competent to transact business and manage his affairs, might easily have arranged to pay and discharge said note without the sacrifice of his property."

In his second amended petition he declares that he knew nothing about the giving of this note; that he was ignorant of the proceedings to foreclose the mortgage; that the whole was a fraud from beginning to end; and that the note was entirely without consideration.

Another feature of the case is, that although there are three bills, including the original and amended bills, each of which purports to be complete in itself, none of them are sworn to either by complainant or by anybody for him; and this is true although the first and second amended bills purport to be bills of discovery, and some fifteen interrogatories are propounded to the defendants by the second amended bill, which they are required to answer under oath. There is also some ambiguity about the length of time during which the plaintiff was in this disabled condition, and there is no clear statement at all. of what was the extent and character of that disability. It is not averred anywhere that he was insane.

As to the length of time of the existence of this disability, it is stated in one paragraph of the last amended bill, that it

existed from the time of his attack in 1859 for something more than ten years, and it is averred, and, apparently in accordance with this, as fixing the time of his recovery of capacity to attend to business: "That in the year 1869 he applied to H. O. Beatty, who had in some early cases been his attorney, for information concerning his affairs with defendants, and was advised by him that he could not act for him as he had been employed by the defendants," and he excuses himself for not seeking other advice or making other investigations, by saying that he was "ignorant of all the facts necessary to lay before an attorney, and could not communicate with a stranger so as to make himself intelligible, and felt himself compelled to accept the status of his affairs as he found them, and was incompetent to investigate and discover for himself the facts and matters hereinbefore recited."

It is to be observed that the facts which it was necessary for him to know in order to institute legal proceedings to recover his rights were those of which he could not well have been ignorant, and with reference to or on account of which he undoubtedly applied to Beatty for advice. These were the facts, that at that time all of his property was in the possession of Haggin and Tevis, who had been receiving the rents and profits, and in their actual use, for five or six years; that the mortgage he had given for $64,000 was on record in the proper office; that the foreclosure proceedings were of record in the court; that all the judgments under which his property was sold were open and notorious, and required only an attorney or person of ordinary capacity to examine them to know their existence; and that if his story, as now stated, of the imposition of the parties upon him were true, he must have known of that fraud, and could easily have ascertained about it, there being no difficulty in examining into the facts, and in obtaining his knowledge of whether he was bound by the proceedings.

We take it for granted, then, that in 1869 the plaintiff had so far recovered his mental faculties as to be aware of the fact that all of his property had passed from him, and was in the possession of the defendants. This, of course, brought

to his knowledge the fact that it was all done by fraudulent means, if the story told in his bill is true. It was, therefore, his duty to at once institute proceedings to correct the wrong done him, and the fact that one lawyer to whom he applied had already been retained by the defendants, instead of being a reason for not proceeding in the matter, was a clear intimation to him that the defendants expected to contest his right, instead of conceding it, and that it was time he should assert that right in a court of justice.

This principal note and mortgage were executed in 1859. The defendants foreclosed and got possession of the property in 1862. The present suit was brought in 1884, twenty-two years after the foreclosure proceedings, and after the possession by the defendants, everything about it being notorious and open to be known to anybody. And if we can suppose that the plaintiff's mental life was a blank up to 1869, there are still fifteen years of silence and inaction and laches unaccounted for. It is obvious that at that time he had sufficient knowledge to understand that his property had passed from him; that it was in the possession of the defendants; that it was claimed that the transfer was obtained under judicial proceedings; and that he must have known that these proceedings were open to investigation; and yet from that time up to 1884, a period of fifteen years, no movement was made to subject the parties to legal proceedings for relief against the frauds and impositions that had been practised upon him. No hindrance is suggested during all this time to any action by him. The sole reason given is, that because he could not get Mr. Beatty, he could not get any other lawyer whom he could rely upon, or who could put him in possession of the facts he needed; and this declaration is made in the face of the fact that every step on which the defendants had to rely were mortgages, duly recorded judgments rendered in open court, sales made in public, and actual possession for twenty-two years of the property in controversy.

We do not need to rely exclusively on the statute of limitations of the State of California, which makes five years the longest period allowed for bringing suit in cases of this kind.

It is sufficient to say, that as a court of equity is governed by the analogies of the statute of limitations of a court of law, and as the object of this suit is to do what generally could be done at law, namely, recover possession of real estate, and as the plaintiff is equally guilty of the laches which a court of equity regards in the same spirit it does the statute of limitation, this unexplained delay after the plaintiff had recovered whatever mental capacity he now has, must stand as a sufficient bar to the successful prosecution of this suit.

Even the principle of a court of equity, that time does not begin to run against a party on whom a fraud has been committed until that fraud has been discovered, can do the plaintiff no good in the present case. That he knew about the fraud, if there was one, in 1869, when he applied to Beatty, who refused to take his case; and that the facts out of which he was bound to know this fraud, if his bill be true, existed, were open, were patent, and could not fail to be discovered by any sort of inquiry or investigation, is so clear that there is no room for the doctrine of his having discovered these facts only a year or two before the suit was brought, or indeed after he had employed counsel.

It is a part of this general doctrine, that to avoid the lapse of time or statute of limitation, the fraud must have been one which was concealed from the plaintiff by the defendant, or which was of such a character as necessarily implied concealment. Neither of these principles can apply to the defendants in this case. The acts which constituted the fraud as alleged in the bill were open and public acts. The note and the mortgage were recorded in the proper public office of the proper county. The possession of defendants was obtained by judicial proceedings which were open to everybody's examination, and which were probably well known in the entire community. The very circumstance that in 1869 the plaintiff consulted a lawyer upon this subject, shows that he was aware of the fact that defendants were contesting his right to the property, and that, if he had made any inquiry at all, he must have known of the proceedings on which they rested their title.

Under all the circumstances of the case, we are satisfied that the two judges who held the Circuit Court were justified in sustaining the demurrer to the bill. The decree is therefore *Affirmed.*