**Cravens L. WANLASS, Energystics, Inc. and Wanlass International, Inc., Plaintiffs–Appellants,**

v.

**GENERAL ELECTRIC COMPANY, Defendant–Appellee.**

No. 97–1425.

United States Court of Appeals, Federal Circuit.

June 8, 1998.

Rehearing Denied; Suggestion for Rehearing In Banc Declined Aug. 10, 1998.*

█

---

* Circuit Judge Schall did not participate in the vote.

Robert M. Taylor, Jr., Lyon & Lyon, LLP Costa Mesa, CA, argued, for plaintiffs-appellants. With him on brief were Robert E. Lyon, James H. Shalek, and Charles C. Fowler.

Robert B. Breisblatt, Welsh & Katz, LTD., Chicago, IL, argued, for defendant-appellee. With him on brief were A. Sidney Katz, and Philip D. Segrest, Jr..

Before MAYER, Chief Judge, MICHEL and RADER, Circuit Judges.

Opinion for the court filed by Chief Judge MAYER. Dissenting opinion filed by Circuit Judge RADER.

MAYER, Chief Judge.

Cravens L. Wanlass, Energystics, Inc., and Wanlass International, Inc. (appellants) appeal the judgment of the United States District Court for the District of Utah, Case No. 2:95–CV–0320–S (consolidated with 2:95–CV–0909–S), which granted General Electric ("GE") summary judgment on the grounds of laches and estoppel. Because the court correctly determined that appellants impermissibly delayed filing suit against GE, we affirm.

### Background

U.S. patent No. 4,063,135 issued on December 13, 1977, and covers a single-phase, alternating current, electric motor that uses a capacitor during the run operation ("single-phase, run capacitor motor"). Craven L. Wanlass is the patent's named inventor and owner. He is also chairman of Energystics, Inc., the exclusive licensee in the United States, and Wanlass International, Inc., the exclusive licensee abroad. In 1977, Wanlass offered GE a license, but GE declined and informed Wanlass by letter dated December 9, 1977, that it did not think his invention was new. GE stated: "We continue to feel positive on the use of run capacitors in appropriate circumstances to raise motor efficiency. We have been doing that for some time and we are for it. It is a good idea. Mr. Wanlass is right in being for it also. What we do not have an answer for is why anyone would think that this is a new idea." GE also published reports characterizing Wanlass' motor design as neither new nor advantageous, which Wanlass claims caused other manufacturers to dismiss his idea.

Following these rejections, Wanlass focused his efforts on three-phase motors and neglected the claimed single-phase motor. Wanlass discussed the three-phase motor application with GE until 1979, at which time GE informed him that it was not interested in his invention. GE and Wanlass had no further relevant contact until 1995, when Wanlass sued GE for infringement. Meanwhile, GE openly made, sold, and marketed single-phase, run capacitor motors whose circuit configuration was the same as that of the allegedly infringing motors in GE's 15 frame Carry Cool® air conditioners. After some initial testing between 1977 and 1982, Wanlass did not test a GE product until April 1992. Appellants rely on these later tests to support the claim of infringement. According to appellants, not all run capacitor motors infringe the patent. The only way to determine whether one does is to test it directly with electrical equipment and study the waveforms with an oscilloscope because the circuit diagram or electrical schematics of the motor alone do not provide adequate information. Testing products for infringement, however, is both easy and inexpensive. The products themselves cost approximately two hundred dollars, the tests require no special equipment, and they take less than two hours.

The court found that no genuine issue of material fact precluded its granting summary judgment for GE on the basis of laches. It concluded that appellants knew or should have known of GE's potential infringement before March 1989 (six years before they filed suit—the "critical date"). Therefore, the court applied the presumption that this delay was unreasonable and prejudicial to GE. Challenging the propriety of the pre-

sumption, appellants argued that the court should measure the period of delay from Wanlass' actual knowledge of GE's alleged infringement because after his initial tests showed no infringement, he had no reason to test products again. The court ruled this excuse, as well as the others—poverty, disappointment over his lack of success, GE's disparagement of his invention, and fear of bringing suit—did not justify the delay. Appellants also argued that GE suffered no economic or evidentiary prejudice. The court determined that GE suffered economic prejudice as a result of GE's significant investments in its single-phase motors, and evidentiary prejudice as a result of unavailable or deceased witnesses and lost or destroyed documents and prototypes. The court also granted summary judgment for GE on the basis of equitable estoppel.** This appeal followed.

### Discussion

■ We review a district court's decision to grant summary judgment *de novo. See Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.,* 60 F.3d 770, 773, 34 U.S.P.Q.2d 1822, 1824 (Fed.Cir.1995). If there is no genuine issue of material fact and the court correctly allocated the burden of proof and considered all pertinent factors, we will not overturn the court's grant of summary judgment on the basis of laches unless it is unreasonable or based on an erroneous legal interpretation. *See A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1039, 22 U.S.P.Q.2d 1321, 1333 (Fed.Cir.1992) (in banc).

■ To prove laches, a defendant must show that "the plaintiff delayed filing suit an unreasonable and inexcusable length of time after the plaintiff knew or reasonably should have known of its claim against the defendant; and ... the delay resulted in material prejudice or injury to the defendant." *Gasser Chair,* 60 F.3d at 773, 34 U.S.P.Q.2d at 1824. To meet the latter prong, a defendant may establish either evidentiary or economic prejudice. *See Aukerman,* 960 F.2d at 1033,

** Because we affirm summary judgment on the basis of laches, we do not reach equitable estop-

22 U.S.P.Q.2d at 1328; *Cornetta v. United States,* 851 F.2d 1372, 1378 (Fed.Cir.1988) (in banc).

Evidentiary, or "defense" prejudice, may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts. Economic prejudice may arise where a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit.

*Aukerman,* 960 F.2d at 1033, 22 U.S.P.Q.2d at 1328–29 (citations and paragraphing omitted); *see also Cornetta,* 851 F.2d at 1378. When raising the laches defense in the summary judgment context, the defendant also must establish that there was no genuine issue of material fact about the delay or the prejudice. *See Gasser Chair,* 60 F.3d at 773, 34 U.S.P.Q.2d at 1824.

■ A delay of more than six years raises a presumption that it is unreasonable, inexcusable, and prejudicial. *See Aukerman,* 960 F.2d at 1035–36, 22 U.S.P.Q.2d at 1331. This presumption shifts to the patentee the burden of producing evidence, which if believed, would show that either the patentee's delay was reasonable or excusable under the circumstances or the defendant suffered neither economic nor evidentiary prejudice. Whenever the presumption arises, including in the summary judgment context, the patentee's evidence must be sufficient to raise a genuine issue of material fact about either the excuse for or reasonableness of the delay, or the existence of the prejudice. *See id.* at 1037–38, 960 F.2d 1020, 22 U.S.P.Q.2d at 1332–33.

■ The period of delay begins at the time the patentee has actual or constructive knowledge of the defendant's potentially infringing activities. *See Eastman Kodak Co. v. Goodyear Tire & Rubber Co.,* 114 F.3d 1547, 1559, 42 U.S.P.Q.2d 1737, 1745 (Fed.

pel.

Cir.1997) ("[D]elay begins when the plaintiff knew, or in the exercise of reasonable diligence should have known, of the defendant's allegedly infringing activity."); *Aukerman,* 960 F.2d at 1032, 22 U.S.P.Q.2d at 1328. The availability of delay based on constructive knowledge of the alleged infringer's activities imposes on patentees the duty to police their rights. "[T]he law is well settled that where the question of laches is in issue the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry." *Johnston v. Standard Mining Co.,* 148 U.S. 360, 370, 13 S.Ct. 585, 37 L.Ed. 480 (1893). Although laches will not bar a patentee whose ignorance is justifiable, ignorance will not insulate him from constructive knowledge of infringement in appropriate circumstances. *See Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.,* 988 F.2d 1157, 1162, 26 U.S.P.Q.2d 1038, 1042 (Fed.Cir.1993) ("Absent actual knowledge, the facts must support a duty of inquiry."); *see also Wetzel v. Minnesota Ry. Transfer Co.,* 169 U.S. 237, 241, 18 S.Ct. 307, 42 L.Ed. 730 (1898) ("The interests of public order and tranquillity demand that parties shall acquaint themselves with their rights within a reasonable time, and, although this time may be extended by their actual ignorance, or want of means, it is by no means illimitable."); *Potash Co. of Am. v. International Minerals & Chem. Corp.,* 213 F.2d 153, 155, 101 U.S.P.Q. 264, 265 (10th Cir. 1954) (In patent cases, like others, "[l]aches will not be imputed to one who has been justifiably ignorant of facts which create his right or cause of action. But ignorance will not of itself excuse delay. The party must be diligent and make such inquiry and investigation as the circumstances reasonably suggest, and the means of knowledge are generally equivalent to actual knowledge.") (citations omitted).

■ These circumstances include "pervasive, open, and notorious activities" that a reasonable patentee would suspect were infringing. *See Hall v. Aqua Queen Mfg., Inc.,* 93 F.3d 1548, 1553, 39 U.S.P.Q.2d 1925, 1928 (Fed.Cir.1996). For example, sales, marketing, publication, or public use of a product similar to or embodying technology similar to the patented invention, or published descriptions of the defendant's potentially infringing activities, give rise to a duty to investigate whether there is infringement. *See id.* (constructive knowledge where defendant sold and marketed allegedly infringing products through print advertisements and trade shows); *Pearson v. Central Ill. Light Co.,* 210 F.2d 352, 356, 100 U.S.P.Q. 285, 288 (7th Cir.1954) (constructive knowledge where defendant published a product brochure, which it distributed to the trade); *A.R. Mosler & Co. v. Lurie,* 209 F. 364, 371 (2d Cir.1913) (barring infringement suit "[w]here owners have remained ... supine for many years, shutting their eyes to what was going on in the art to which the patent belonged"). *See generally* Jean F. Rydstrom, Annotation, *Laches as defense in patent infringement suit,* 35 A.L.R. Fed. 551, 577–79 (1977) (examining cases in which constructive knowledge was imputed to the patentee).

■ Furthermore, constructive knowledge of the infringement may be imputed to the patentee even where he has no actual knowledge of the sales, marketing, publication, public use, or other conspicuous activities of potential infringement if these activities are sufficiently prevalent in the inventor's field of endeavor. The patentee who is negligently or willfully oblivious to these types of activities cannot later claim his lack of knowledge as justification for escaping the application of laches because

> the law imputes knowledge when opportunity and interest, combined with reasonable care, would necessarily impart it. Not to improve such opportunity, under the stimulus of self-interest, with reasonable diligence, constitutes laches which in equity disables the party who seeks to revive a right which he has allowed to lie unclaimed from enforcing it, to the detriment of those who have, in consequence, been led to act as though it were abandoned.

*Wollensak v. Reiher,* 115 U.S. 96, 99, 5 S.Ct. 1137, 29 L.Ed. 350 (1885). The Supreme Court has consistently imputed to parties who failed to examine readily available infor-

mation the knowledge contained in it and the results of inquiries that the knowledge would have motivated a reasonable man to conduct. *See, e.g., Wetzel,* 169 U.S. at 240–41, 18 S.Ct. 307 (finding a duty to inform oneself of ownership of land in light of readily apparent facts in the public records that suggested the transfer of the land to another was improper); *Foster v. Mansfield, C. & L.M. R.R. Co.,* 146 U.S. 88, 99–100, 13 S.Ct. 28, 36 L.Ed. 899 (1892) (imputing knowledge of fraud where party, with reasonable diligence, could have learned of the facts suggesting fraud by questioning people readily available to him); *Norris v. Haggin,* 136 U.S. 386, 392, 10 S.Ct. 942, 34 L.Ed. 424 (1890) (imputing knowledge where "the facts out of which [the party] was bound to know th[e] fraud ... were open, were patent, and could not fail to be discovered by any sort of inquiry or investigation"); *Burke v. Smith,* 16 Wall. 390, 83 U.S. 390, 401, 21 L.Ed. 361 (1872) (imputing knowledge of fraud where records that suggested the fraud were open to inspection and party failed to review them). The Court of Customs and Patent Appeals also emphasized that "[s]elf-interest and the proper attention ... owed as a reasonable man in the management of such a valuable property right as a patent require[s] ... [patentees to] exercise ... [their] own careful judgment in" matters relating to their patents. *In Re Dufault,* 41 C.C.P.A. 971, 214 F.2d 181, 183, 102 U.S.P.Q. 253, 254 (1954) (referring to the duty to study and appraise the scope of an issued patent promptly); *see also Wollensak,* 115 U.S. at 99, 5 S.Ct. 1137 (imputing knowledge of insufficient claim scope where patentee failed to examine the issued patent).

Open and notorious potentially infringing conduct gives patentees the opportunity to recover damages based on their exclusive rights. Therefore, a reasonable patentee, motivated by his interest in recovering for and preventing infringement, keeps abreast of the activities of those in his field of endeavor. Allocating the burden to patentees to seek out infringers is proper, furthermore, because compared to potential infringers, they are in the best position to know the scope of their patent protection and, therefore, also to know likely places to find infringement. This superior knowledge generally allows them to incur comparatively lower costs in investigating potentially infringing activities than competitors would incur conducting patent searches on every aspect of their products and notifying the patentee of their results.

■ Viewing the evidence in the light most favorable to appellants, we agree that Wanlass and his licensees should have known of GE's infringement before the critical date of March 1989.*** Although appellants allege that GE began infringing the patent in 1986, Wanlass did not test an accused product until 1992. GE's open and notorious sale of easily testable products gave him the opportunity to discover the alleged infringement earlier. Determining that GE was not infringing his patent in the late 1970's did not absolve Wanlass of his duty to conduct future investigations.

Appellants argue that it would have been too burdensome to test GE's products after Wanlass' initial tests because eight or nine hundred GE products contain run capacitor motors and not all run capacitor motors infringe the patent. Further, because GE never informed Wanlass that it began using run capacitors pursuant to his patent's teachings,

*** Indeed, while we need not rely on it, the evidence shows that Wanlass had actual knowledge of GE's infringement in 1987. Wanlass sent L.E. Potempa an undated letter explaining that after his contact with GE in the late 1970's, GE "proceeded to use [his] patented technology in their single phase air conditioning compressor motors. Since these motors [were] for OEM applications only, [he] didn't discover this until about 8 years later." Notwithstanding appellants' tortured interpretation of this letter as meaning that Wanlass discovered the infringement in 1992 and deduced that it had begun in the 1980's, the only reasonable one is as an admission that he actually knew of the infringement in 1987 (eight years after 1979, when GE and Wanlass ceased negotiations). The only contrary evidence is Wanlass' own self-serving statements about this letter, which he admits not remembering. These statements do not raise a genuine issue of material fact concerning the otherwise blatant admission. *See Sinskey v. Pharmacia Ophthalmics, Inc.,* 982 F.2d 494, 498, 25 U.S.P.Q.2d 1290, 1293 (Fed. Cir.1992) ("To allow [a party] to preclude summary judgment simply by contradicting his own prior statements would seriously impair the utility of Federal Rule of Civil Procedure 56.").

he did not know which GE products to test. If Wanlass believed that only some uses of run capacitors infringed his patent, then the natural course of action would have been to examine GE motors from time to time to determine whether they had begun to use run capacitors in an infringing way. The frequency with which these types of investigations should have occurred is a function of their cost and difficulty. *Cf. Potash*, 213 F.2d at 159–60, 101 U.S.P.Q. at 269 (applying laches where the inspection necessary to determine infringement "was a comparatively simple matter," but the patentee delayed the inspection for six years and the suit an additional three years). It certainly is not reasonable, however, to conduct no investigation for over ten years, when testing products is as easy and inexpensive as it is here. Moreover, because Wanlass was able to find an allegedly infringing GE motor quickly once he actually tried, we doubt that identifying potentially infringing products is as difficult as appellants argue.

Wanlass' failure to investigate GE's products is especially egregious in light of his past dealings with GE. After offering GE a license on the patent at issue, and being told that GE considered the patent invalid and intended to continue to use run capacitors "to raise motor efficiency," Wanlass was on notice that GE was a potential infringer because his invention used run capacitors to improve motor efficiency. The facts in this case, therefore, overwhelmingly give rise to a duty to investigate GE's possibly infringing activities, which Wanlass failed to discharge. If he had complied with this duty, he would have known of GE's infringement in 1986 or 1987, and certainly before the critical date of 1989. Therefore, the presumption of laches applies.

Appellants argue that even if they should have known of the infringement, Wanlass' prior dealings with GE justified the delay. They argue that GE's hostility and the entire industry's misunderstanding of the invention caused Wanlass to believe that neither GE nor anyone else would use his invention. Widespread misunderstanding of an invention serves only to heighten a reasonable patentee's suspicion that competitors are in-

fringing his patent because their lack of understanding prevents them from taking steps to avoid infringement. Furthermore, GE's clear intention to employ run capacitors to improve motor efficiency renders Wanlass' inference that GE would not infringe his patent unreasonable.

Appellants also fail to rebut the presumption of prejudice because they did not offer credible evidence that GE suffered no prejudice. Although appellants bore the burden of showing a lack of both evidentiary and economic prejudice, their brief speaks primarily of GE's failure to offer proof. We do not reach the issue of whether appellants raised a genuine issue of material fact over whether GE suffered economic prejudice because GE undoubtedly suffered evidentiary prejudice as a direct result of the delay. Aside from the deceased and unavailable witnesses, and the fading memories of available witnesses, including Wanlass himself, GE no longer has 10 frame Carry Cool® air conditioners, which were on the market from 1976 to 1984. GE claims these models operated exactly like the accused 15 frame Carry Cool® models and had the same circuit configuration and capacitors of similar size. Appellants dispute this assertion and maintain that the circuit diagram alone cannot show infringement; only oscilloscope readings taken directly from an actual motor provide sufficient information. Appellants argue further that because GE's destruction policy required their disposal before 1986, it would not have had a 10 frame model to test even if they had brought suit earlier. To the contrary, if Wanlass had notified GE of his claim when he should have known of the possible infringement by the 10 frame air conditioners, GE may not have discarded these models. Moreover, if Wanlass had fulfilled his duty to police his rights, he would, himself, have the evidence pertaining to the 10 frame models. Because he knew that the only way to determine whether a motor infringes is through actual testing, he was on notice that failure to test motors would likely result in evidentiary prejudice. Appellants have not rebutted the presumption of prejudice.

### Conclusion

Accordingly, the judgment of United States District Court for the District of Utah is affirmed.

*AFFIRMED.*

RADER, Circuit Judge, dissenting.

I respectfully dissent. The majority affirms the grant of summary judgment. In so doing, it misapplies the doctrine of laches by imposing on patentees the affirmative burden to police the marketplace.

### I

Wanlass tested some General Electric motors between 1977 and 1982 and found no infringement. Wanlass then turned his attention to other potential infringers. General Electric in 1986 changed to an allegedly infringing motor design. Wanlass did not discover the alleged infringement until 1992. He filed suit in 1995. This court upholds, under the strictures of summary judgment, a determination that Wanlass unreasonably delayed bringing suit. To the contrary, Wanlass had no way to detect that General Electric had made infringing changes. Nonetheless, this court imposes on Wan-

lass—a small businessman and inventor—the costly and unreasonable burden of periodically checking and rechecking every product in this crowded market to detect infringement. Because Wanlass did not recheck General Electric's motors and did not discover the alleged infringement until 1992, this court construes all facts against him and denies him any chance to proceed with his suit.

In affirming the grant of summary judgment, this court determined that there were no genuine disputes of material fact and that General Electric was entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). This court bases its holding on a determination that Wanlass should have discovered General Electric's alleged infringement sometime before April 1989.*

To my eyes, the law does not entitle General Electric to judgment. In 1979, General Electric indicated to Wanlass that it was not interested in licensing his patents. Between 1977 and 1982, Wanlass had tested a number of motors, including some made by General Electric. His tests did not uncover any motors that infringed his patent. In sum, construing disputed facts in Wanlass's favor as

---

* As an alternative basis for its result, this court suggests that Wanlass had actual knowledge of General Electric's infringement in 1987. This court reaches this conclusion due to its interpretation of the Potempa memo. However, the meaning of this memo is not clear enough for resolution on summary judgment. This decision interprets the key word in the memo—"then"—as meaning "soon after that." With this interpretation, the delay—"about 8 years"—between the start of General Electric's infringement and Wanlass's discovery would suggest that Wanlass had actual knowledge of General Electric's infringement in 1987.

However, *Webster's* also defines "then" as "being next in a series," without defining a more precise temporal connection between the events. This second meaning is a common usage. Given that Wanlass is describing a series of events, this meaning is as consistent with the context as that chosen by the majority. This definition does not fix the time between the tests and the start of infringement. Thus, if Wanlass was using "then" in this second sense, as he himself has suggested, it would be inappropriate to infer actual knowledge from this memo.

Furthermore, the memo does not identify which General Electric products Wanlass believed to infringe. Because laches is a claim

specific defense, *cf. Gasser Chair Co. v. Infanti Chair Mfg. Corp.,* 60 F.3d 770, 773, 34 U.S.P.Q.2d 1822, 1824 (Fed.Cir.1995); *Aukerman,* 960 F.2d at 1029–30 (referring to laches as a defense to a claim of infringement), the presumption of laches would not be triggered unless it were shown that the memo was referring to the products accused in this suit. If Wanlass suspected that some other General Electric product was infringing in 1987, this would be evidence of the unreasonableness of his delay and his failure to discover the alleged infringement. The application of laches with respect to one product would not, however, act as a bar to the assertion of a claim against a different product produced by the same manufacturer.

Moreover, if the memo does refer to the motors that are the subject of this suit, summary judgment would still be inappropriate. Wanlass testified that he did not discover the infringement until 1992. Therefore, even if the majority's interpretation of the memo is correct, the most that the Potempa memo can do is create a genuine dispute over a material fact—when Wanlass discovered General Electric's alleged infringement.

required on summary judgment, these early tests and negotiations lulled him into the belief that General Electric was not interested in his technology and would not infringe.

In 1986, however, General Electric changed its motor design in a way that allegedly infringes Wanlass's patent. General Electric did not inform Wanlass of its changed design. Nonetheless this court determines that Wanlass had a duty to discover the change. The problem with that determination is that the accused motors operate inside air conditioners and refrigerators. To discover a change would require Wanlass to disassemble appliances to access the motor and then dismantle the motor to discover the internal changes. Indeed, Wanlass theorizes that alterations in one internal part of the motors altered its magnetic properties and caused the infringement. (In light of this theory, which is consistent with the teachings of Wanlass's patent, this court's emphasis on the unchanged circuit diagram is misplaced.) In addition to the complexity of discovering a single instance of infringement, the record of this case shows that General Electric is not the only manufacturer of this type of electric motors in the United States. Many companies make many different models of electric motors for a wide variety of applications. Yet this court requires Wanlass to check and recheck them for infringement, even if he had early indications that a company was not infringing.

Because these undisputed record facts do not establish that Wanlass's failure to discover the alleged infringement before 1989 was unreasonable, this court imposes on Wanlass an affirmative duty to police his patent. This duty allegedly arises from General Electric's "pervasive, open and notorious activities" that a reasonable patentee would suspect were infringing. *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1553, 39 U.S.P.Q.2d 1925, 1928 (Fed.Cir.1996). The *Hall* case, however, is very different from Wanlass's case. In *Hall*, the patentee had knowledge of other open and notorious potential infringements. In *Hall*, the accused devices were also widely advertised in trade journals and advertised at trade shows. *See id.* Hall himself, the patentee, was the head of a trade organiza-

tion. He attended many of these shows and spoke with the management of the accused infringers. Indeed, "Hall [was] a prominent figure in the ... industry throughout the 1970s and 1980s." *Id.* at 1552. In light of these facts, this court properly charged Hall with knowledge of the alleged infringing activities.

In contrast, Wanlass had no indications of widespread infringement to raise his suspicions. General Electric's new motor was not described in any trade publication in sufficient detail to place Wanlass on notice of the possible infringement. Indeed, the record does not indicate when, if ever, General Electric's change in its electric motor design became known outside of General Electric. Moreover, unlike Hall, Wanlass had checked once for infringement and had unsuccessfully tried to license various manufacturers of single phase motors. For good reason, therefore, Wanlass had turned his attention to larger three-phase motors used in industrial applications. A number of articles in business publications described him as abandoning the single phase motor field. Unlike Hall, Wanlass can hardly be described as a prominent figure in the electric motor industry. This court must stretch *Hall* far beyond its facts to apply it to Wanlass.

In order to bridge the gap between *Hall* and the present case, the majority charges Wanlass with constructive knowledge of General Electric's potential infringement. The majority holds that Wanlass should have discovered the alleged infringing motors within two to three years after General Electric started production. This court explains that General Electric's "sales, marketing, publication, public use, or other conspicuous activities of potential infringement [were] sufficiently prevalent in the inventor's field of endeavor." Again, this standard amounts to a duty on Wanlass to check and recheck large potential infringers.

Ironically, Wanlass had checked General Electric. This fact adds to the confusion of this court's summary judgment result. This court imposes on the patentee the burden to conduct a reasonable scheme of product testing designed to enforce his patent. But what is a reasonable testing program? In this

case, Wanlass conducted initial tests on motors that were manufactured by General Electric and others. Having discovered no infringement, he turned to other activities until his discovery in 1992. As noted above, electric motors are commonly used in a wide variety of applications. Some devices with motors that might use the Wanlass technology are relatively inexpensive. Others are very expensive. Rather than consider these facts (and others that might have been in the record had the parties known that this court would impose this duty on Wanlass), this court pronounces Wanlass's failure to re-check *per se* unreasonable. At the very least, this case should be vacated and remanded so the district court could consider whether Wanlass should be charged with constructive knowledge under the majority's new standard and whether his decision to cease testing was reasonable in light of all of the circumstances.

## II

Because the majority announces new legal rules and offers so little guidance, patentees can only look to the facts of this case. What they will see will be disheartening, as it represents a substantial new burden. Wanlass's patent claimed an improvement to a component used in a wide variety of applications. The component was not the focus of the advertising campaigns for these products, nor would it have been a feature sought by purchasers of the equipment. Indeed, this court does not say why Wanlass, who had tested General Electric products in the past, should have suspected that General Electric had made changes that resulted in infringement of his patent. Instead this court assumed that, because General Electric is a large company with widely distributed products, Wanlass should have known what it was doing. Therefore, this case places upon patentees the duty to test any product that might contain the claimed invention. For inventions, such as Wanlass's, that have broad potential application, this new requirement is a significant burden.

The rule created by this case is unnecessary. Patentees already have an incentive to enforce their patents. By placing an extra incentive on the patentee, this decision will prompt patentees to over-invest in patent enforcement. This court's *per se* rule requiring testing and retesting also overlooks the public notice function of claims. *See Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 117 S.Ct. 1040, 1051, 137 L.Ed.2d 146 (1997) (noting that the "role of claims [is to] defin[e] an invention and provid[e] public notice."). The requirement that patentees mark patented articles before they can collect damages, *see* 35 U.S.C. § 287(a), is further designed to provide notice of the patent. Public notice alerts other parties to avoid making use of patented subject matter. In allocating too much of the burden of policing the patent to the patentee, this court undervalues the fundamental principle that the public has a duty to avoid infringement.

## III

Because this decision announces new rules of law that place substantial burdens on patentees and improperly affirms summary judgment in the face of genuine disputes of material facts, I must dissent.