**IXYS CORPORATION, Plaintiff,**

v.

**ADVANCED POWER TECHNOLOGY, INC., Defendant.**

**And Related Counterclaims.**

**No. C 02–03942 MHP.**

United States District Court, N.D. California.

June 16, 2004.

Robert Paul Feldman, Christopher D. Catalano, Michael Barclay, Wilson Sonsini Goodrick & Rosati, Palo Alto, CA, for Plaintiff.

Vickie L. Feeman, William Sloan Coats, III, Bas de Blank, Tarek J. Helou, Orrick

Herrington & Sutcliffe LLP, Menlo Park, CA, Alexander Charles Johnson, James Edward Harris, Marger Johnson & McCollom, P.C., Portland, OR, for Defendant.

**MEMORANDUM AND ORDER RE: DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT LIMITING REMEDIES BASED ON LACHES**

PATEL, Chief Judge.

Plaintiff IXYS Corporation ("IXYS") filed this action against defendant Advanced Power Technology, Inc. ("APT"), alleging infringement of two U.S. patents, numbered 5,486,715 (the " '715 patent") and 5,801,419 (the " '419 patent"), that it holds on an improved design for power MOSFET devices. APT has counterclaimed for infringement of its patents, numbered 5,283,202 (the " '202 patent") and 5,262,336 (the " '336 patent"), which teach a design for diodes with lifetime control. Now before the court is APT's motion seeking partial summary judgment that IXYS's remedies are limited due to the equitable doctrine of laches. After having considered the parties' arguments and submissions, and for the reasons set forth below, the court rules as follows.

*BACKGROUND* [1]

IXYS and APT have been active competitors in the market for power MOSFETS and other semiconductor devices for over a decade. APT has been producing dual-metal power MOSFETS for sale since at least January 1991, when it began marketing the APT 208, and a second incarnation of the product (known internally as the "APT 208x") was sold from late 1991 until late 2001. Tsang Dec. to APT's Motion for Summary Judgment of Invalidity for An-

ticipation ¶ 13. APT began selling its POWERMOS V devices in early 1997, its POWERMOS VI devices in 1999, and its POWERMOS VII devices in 2000. *See generally* Def. Mot., Exh. 9. IXYS's '715 patent was issued by the patent office on January 23, 1996, and the '419 patent was issued more than two years later on September 1, 1998. IXYS filed this action on August 15, 2002, accusing of infringement a panoply of APT products, viz., "(a) any and all Power MOS 7® products or Power MOS V® (Generation 5) products with dual-layer metallization manufactured, used, sold, or offered for sale by APT on or after August 15, 1996, and (b) any and all products manufactured, used, sold, or offered for sale by APT on or after August 15, 1996 that are designed in substantially the same way, or function in substantially the same way, as APT 5018BLL [a Power MOS 7™ MOSFET]." Feeman Dec. in Support of Def. Mot. for Summary Judgment of Invalidity for Anticipation, Exh. 4, at 2 (Pl. Disclosure of Asserted Claims and Preliminary Infringement Contentions).

*LEGAL STANDARD*

I. *Summary Judgment*

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* The moving party for summary judgment bears the burden of identifying those portions of the pleadings, discovery and

---

**1.** The background facts are drawn from the parties' moving papers, unless otherwise not- ed.

affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the non-moving party's case." *Id.*

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Mere allegations or denials do not defeat a moving party's allegations. *Id.; see also Gasaway v. Northwestern Mut. Life Ins. Co.,* 26 F.3d 957, 960 (9th Cir.1994). The court may not make credibility determinations, *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505, and inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion. *Masson v. New Yorker Magazine,* 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991).

The Federal Circuit applies the same standard for summary judgment. *See, e.g., Southwall Techs., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1575 (Fed.Cir.1995); *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.,* 731 F.2d 831, 835 (Fed.Cir.1984). The Federal Circuit has repeatedly held that summary judgment is as appropriate in patent cases as in any other type of case. *See, e.g., Paragon Podiatry Lab., Inc. v. KLM Lab., Inc.,* 984 F.2d 1182, 1190 (Fed.Cir.1993); *Hodosh v. Block Drug Co.,* 786 F.2d 1136, 1141 (Fed.Cir.1986).

### II. *Laches*

A defendant in a suit for patent infringement may bring a defense of laches when the plaintiff has acted with "neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1029–30 (Fed. Cir.1992) *(en banc ).* In order to invoke a defense of laches, "a defendant has the burden to prove two factors:

1. the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant, and

2. the delay operated to the prejudice or injury of the defendant."

*Id.* at 1032. "The period of delay is measured from the time the plaintiff knew or reasonably should have known of the defendant's alleged infringing activities to the date of suit," but does not begin to run before the patent is issued. *Id.*

When evaluating a defendant's laches defense, a court must consider the particular facts and circumstances of the case at hand and "weigh the equities of the parties." *Id.* "The length of time which may be deemed unreasonable has no fixed boundaries but rather depends on the circumstances." *Id.* (citations omitted). However, a delay of at least six years before bringing suit raises a presumption that such a delay was both unreasonable and prejudicial to the defendant. *Adelberg Lab., Inc. v. Miles, Inc.,* 921 F.2d 1267, 1271 (Fed.Cir.1990).

### DISCUSSION

I. *Determination of the Beginning Date of the "Laches Period"*

 A. *Constructive and Actual Knowledge of APT's Infringing Activities*

As an initial matter, this court must determine the date—after the filing of the relevant patent or patents—on which "plaintiff knew or reasonably should

have known of the defendant's alleged infringing activities to the date of suit." *Aukerman*, 960 F.2d at 1032. As competitors within the same field, APT and IXYS presumably maintained at least a passing familiarity with each others' products and progress. IXYS admits to collecting, as a regular practice, data sheets describing APT devices, presumably including data sheets describing APT's POWERMOS V line. Helou Dec., Exh. 4, at 204; *id.* at Exh. 5, at 3155–3160 (datasheets of POWERMOS V products). Also in circulation were various publications and articles describing the technical specifications of APT's products. *See id.* at Exhs. 7 & 8.

It is undisputed that APT has been manufacturing dual-metal MOSFET devices that include an aluminum layer overlying the gate polysilicon layer (and otherwise bear a strong resemblance to the invention described in IXYS's patents) since long before 1996. In addition to its general awareness of these products, it appears that IXYS was testing APT's devices—at least for the purpose of characterizing them—as early as 1992. *See id.* at Exh. 5, Sub–Part 4, at 6177–78 & 6181; *id.* at Exh. 6, at 16–18. However, it is this court's understanding of the technology involved in these devices that it is one matter to test the operating characteristics of a power MOSFET and quite another to actually slice the device open and examine its component structure under a microscope. It may well be that conducting such additional tests as a matter of course is a technologically simple and economically feasible endeavor. Yet APT has not offered any evidence to indicate as such. The facts available upon the record regarding IXYS's pre–1998 behavior do not demonstrate that IXYS had actual knowledge of

APT's development of potentially infringing devices, and they do not demonstrate that IXYS was in the habit of conducting the type of tests that might reveal APT's alleged infringement. *Cf. Wanlass v. Gen. Elec. Co.*, 148 F.3d 1334, 1336 (Fed.Cir. 1998) (plaintiff had conducted the type of tests necessary to determine whether defendant's products infringed more than one decade before filing claims of infringement, and these tests were "both easy and inexpensive" to perform). In the absence of such evidence, this court is loath to impose upon IXYS a requirement to "polic[e] the industry" in a fashion that it had not already undertaken. *Wanlass v. Fedders Corp.*, 145 F.3d 1461, 1465 (Fed.Cir. 1998) ("[P]olicing the industry would require testing of an unknown number of models. Imposing a duty upon Wanlass to monitor the air-conditioning industry by periodically testing all others' products, therefore, would be unreasonable."). The court finds that there is a triable issue of fact regarding whether IXYS had actual or constructive knowledge before 1998 that APT might be infringing its patents.

In 1998, however, IXYS's practice appears to have changed. IXYS documents dated January 29, 1998, show that IXYS had conducted some additional tests of an APT product or products (possibly the 114, a device that IXYS has not accused of infringement), including analyzing (at minimum) the layout and packaging of the devices; one of the documents even references APT's "second metal." *See id.* at 5233–5235. Dr. Zommer admits that these documents reflect IXYS's efforts to analyze APT's products and acknowledges that this analysis revealed that APT's devices included a "second metal." Zommer Dec. ¶ 14.[2] IXYS's acquisition of this level

---

**2.** The court views these documents as by far the most significant among all of the pages attached as Exhibit 5 to the Helou Declaration. Because IXYS—through the person of

Dr. Zommer—has essentially authenticated and explained these pages, the court need not address the remainder of IXYS's objections to

of structural information regarding APT's device or devices indicates that IXYS had examined the product in sufficient detail to inform itself regarding whether the APT devices possessed the elements of IXYS's patented inventions. Irrespective of whether IXYS believed that this first device infringed (and it almost surely came close, at the very least), by January 1998 IXYS had proven its willingness and ability to conduct the type of tests necessary to determine whether other APT products infringed. The fact that such an analysis was not undertaken with the intent of ascertaining whether APT's products infringed (*see id.*)-and the fact that the analysis was not necessarily conducted upon a product now accused of infringement—is immaterial; after these experiments, IXYS almost surely had actual knowledge (and unquestionably had constructive knowledge) that APT's products allegedly infringed its patents. Any further doubts on IXYS's part could (and should) have been resolved through additional testing; IXYS has offered this court no reason to believe that in 1998 such testing would have been technologically or economically infeasible. IXYS's claims at oral argument that the 1998 analyses—which were not necessarily conducted with the intention of determining infringement—did not confer upon IXYS the requisite knowledge and notice of infringement are simply unpersuasive.

Despite these tests, IXYS argues that it had no reason to believe that APT was infringing its products until September 2000, when APT introduced its MOS VII line of devices. The important distinction, according to IXYS, is that APT's pre–1997 devices (including the MOS IV line) did not employ source metal overlying the gate structures and thus did not infringe the IXYS patents. *See* Zommer Dec. ¶ 8. IXYS was not alerted to possible infringement in 1997, when APT released the MOS

V line of products, because the press releases describing those products did not indicate that APT's construction modes deviated in any significant respect from its previous devices. *See, e.g., id.* at Exh. 10. By contrast, explains IXYS, the press releases describing APT's MOS VII devices mentioned "APT's patented metal on polysilicon gate structure" and reduced input capacitance. *Id.; see also* Pl. Opp., at 3 ("Notably, APT's March 18, 1997 press release contained no similar reference.").

However, the September 2000 APT press releases—which IXYS labels as the source of its belief that APT was manufacturing infringing devices—contain no mention whatsoever regarding whether the source metal overlies the gate areas. *See* Zommer Dec., Exh. 11. Moreover, the feature that these press releases *do* describe, viz., the metal-on-polysilicon gate structure, was present in documents describing APT products as far back as 1988. *See* Zommer Dec., Exh. 4, at 2, Figure 2 (diagram showing APT's POWERMOS IV device, which includes a layer of aluminum gate metal overlying a layer labeled "poly," which itself overlies a layer of gate oxide insulator). As far as the court can discern, there is no meaningful distinction between APT MOS VII press releases and APT-related material previously in the public domain. Consequently, IXYS's claim to have realized that APT might infringe its patents only upon the publication of the MOS VII releases is not logically tenable. The court thus finds that IXYS knew or should have known that APT was engaging in allegedly infringing conduct no later than January 29, 1998. There exists no genuine issue of material fact regarding IXYS's knowledge on that date. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

the introduction of these documents into the record for purposes of this motion.

**B. IXYS's Related Patents**

■ IXYS's '419 patent issued in September 1998, approximately seven months after IXYS gained actual or constructive knowledge that APT was engaging in allegedly infringing conduct. Under very similar circumstances, the Federal Circuit has held that it was not unreasonable for a plaintiff to wait until the issuance of a related patent before filing a suit of infringement and tolled the laches period accordingly such that it began only with the issuance of the second patent. *See Meyers v. Asics Corp.*, 974 F.2d 1304, 1307 (Fed.Cir.1992) ("*Brooks Shoe* also held that it was not unreasonable for Meyers to wait until the second patent (the '283 patent) issued to sue on the first and second patent together.... Thus, for both the '797 and '283 patents, the reasonableness of Meyers' delay depends only on his activities during the four years between the date the '283 patent issued and the date Meyers filed his suits.") (citing *Meyers v. Brooks Shoe Inc.*, 912 F.2d 1459, 1462 (Fed.Cir.1990) (*overruled on other grounds by Aukerman*, 960 F.2d 1020) (holding that plaintiff who learned of infringement less than one year prior to issuance of divisional patent acted reasonably in waiting to sue until second patent was issued where plaintiff alleged that all accused products infringed both patents)). While IXYS could have asserted the '715 patent in January 1998, immediately upon recognizing (actually or constructively) that APT's devices possibly infringed, simultaneous suit on both IXYS patents "conserve[s] both the parties' and the courts' resources." *Brooks Shoe*, 912 F.2d at 1462. The court will thus date the beginning of the laches period to the issuance of the '419 patent on September 1, 1998. Because IXYS filed suit fewer than six years later, no presumption of unreasonableness and prejudice attaches here. *Adelberg*, 921 F.2d at 1271.

**C. Unreasonable or Inexcusable Delay**

■ A determination of what period of time constitutes an "unreasonable" or "inexcusable" delay is a question of fact specific to each case, and courts have provided little direct guidance on this issue. *See Aukerman*, 960 F.2d at 1032. It appears, nevertheless, that courts have typically found a period of delay "unreasonable" only when it substantially exceeded the four-year period at issue here. *See, e.g., Adelberg*, 921 F.2d at 1271 (eleven years of delay found to be unreasonable); *Wanlass*, 148 F.3d at 1336–37 (more than six years' delay unreasonable). By comparison, the Federal Circuit has held that a delay of four years was not unreasonable when that delay was occasioned by explainable conduct on the part of the plaintiff, viz., "negotiating with his attorney, negotiating with other parties for licenses." *Asics*, 974 F.2d at 1307. The Circuit has pronounced a three or four-year delay unreasonable only when that delay was accompanied by extraneous improper tactics or misleading conduct by the plaintiff. *See, e.g., MCV, Inc. v. King–Seeley Thermos Co.*, 870 F.2d 1568, 1572 (Fed.Cir. 1989) (plaintiff told defendant "that possessing some right to the patent was unimportant to him"); *Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1550 (Fed.Cir.1984) ("Beckman informed Rosemount of the Model 960B shortly after the complaint was filed and long before trial. Rosemount's charge that the 960B infringed was made three years after it was first informed."). IXYS has not engaged in any comparable conduct.

IXYS's first contact with APT regarding its belief that APT's devices infringed IXYS's patents took the form of a letter sent by IXYS's CFO, Arnold Agbayani, to APT's President and CEO on January 26, 2001. Zommer Dec., Exh. 12. The facts, even as proffered by IXYS, thus evince an

unexplained period of delay, spanning the period from the issuance of the '419 patent on September 1, 1998, until the Agbayani letter of January 2001, and thus lasting approximately twenty-nine months. While the court is troubled by this expansive period of apparent inaction, and while further testing of APT products and deliberations with IXYS lawyers should not have taken twenty-nine months to complete, there nevertheless exists a triable issue of fact regarding whether IXYS's dilatory filing—and the period of delay it caused—was unreasonable; in light of governing Federal Circuit precedent, the court cannot pronounce it unreasonable as a matter of law. *See, e.g., Asics,* 974 F.2d at 1307. Because a rational fact-finder could find that IXYS did not unreasonably or inexcusably delay the filing of its complaint, this court must deny APT's motion for summary judgment on this issue. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505.

## II. *Prejudice*

Because this court has already held that there exists a material question of fact regarding whether IXYS unreasonably delayed the filing of its complaint, the court need not reach the question of whether APT has suffered prejudice from IXYS's delay. Nevertheless, the court will briefly consider APT's case for prejudice, as even such a brief review demonstrates that APT has not met its burden under the summary judgment standard.

### A. *Evidentiary Prejudice*

 APT asserts that IXYS's dilatory behavior has prejudiced APT in the litigation of this case due to the fact that documents have been lost and witnesses' memories have faded in the intervening years. *See Aukerman,* 960 F.2d at 1033. Yet APT has offered only legally insufficient proof of such prejudice. APT's claim that "many of the fact witnesses' recollec-

tions were diminished by this unreasonable delay," Pl. Mot., at 10, is not supported by so much a single citation to the voluminous factual record. Dr. Tsang's non-specific declaration that "APT's routine document retention caused older documents to be lost," including "evidence supporting APT's invalidity contentions," Tsang Dec. ¶ 10, is a legally inadequate means of establishing prejudice upon a motion for summary judgment. *See Asics,* 974 F.2d at 1308 ("Conclusory statements that there are missing witnesses, that witnesses' memories have lessened, and that there is missing documentary evidence, are not sufficient."). APT has not successfully demonstrated that it has suffered evidentiary prejudice.

### B. *Economic Prejudice*

 APT asserts that it has suffered economic prejudice in two separate fashions from IXYS's delay in bringing suit. Neither of these assertions is sufficient to carry APT's burden at summary judgment. First, APT claims that its year 2000 public stock offering ensnared many "innocent members of the investing public" within an infringement trap that IXYS triggered only several years after it became aware of the activity that would later form the basis for its accusations. APT has not offered any evidence to indicate that this public offering would not have taken place had IXYS sued APT much earlier; indeed, it has not even advanced this argument. APT's shareholders may eventually suffer some economic harm due to IXYS's suit, but APT has adduced no reason to believe that this harm to the shareholders (and to APT itself) has been augmented by IXYS's filing delay, and thus no reason to find that APT has suffered prejudice on these grounds. *See Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.,* 60 F.3d 770, 775 (Fed.Cir.1995) ("We reiterate that a change in the eco-

nomic position of the infringer during the period of delay must be as a result of the delay; the infringer must prove that the change in economic position would not have occurred had the patentee sued earlier.") (citing *Aukerman,* 960 F.2d at 1033).

■ Second, APT points to the substantial investment it has made over the last five years in research and development of product lines that now stand accused of infringement. *See* Tsang Dec. ¶ 11 ("APT estimates that it has invested roughly $1,000,000 per year in research and development of its dual-layer metal power MOSFET devices over the past five years."). APT asserts, not improbably, that it would never have made this investment in developing (and producing) potentially infringing devices had it known of IXYS's intention to sue at an earlier date. Yet this contention is belied by the fact that APT has continued to develop and market its allegedly infringing products during the pendancy of this litigation despite the fact that, by Dr. Tsang's own admission, APT has already developed a quick, inexpensive means of producing equivalent devices that would be far less likely to be found to infringe. *See* Catalano Dec., Exh. 2, at 789–791 (Tsang Dep.). APT's decision not to implement this alternative design casts serious doubt upon its claim that it would have devoted its research and development dollars elsewhere had IXYS's lawsuit come to the fore at an earlier date. Indeed, APT has always maintained that the IXYS patents are invalid, and APT's actions betray no indication of an intention to hedge against the threat that a court might find otherwise. *See id.* at 801 & Exh. 181 (opinion letter concluding that IXYS's patents are invalid). By consequence, a reasonable juror might well conclude that APT would similarly have refused to change its engineering practices even in the event that IXYS had filed suit at an earlier date. A materi-

al issue of fact exists on this question, and summary judgment would be improper.

*CONCLUSION*

For the reasons set forth above, the court DENIES defendant's motion for summary judgment.

IT IS SO ORDERED.