In re KATZ INTERACTIVE CALL PROCESSING PATENT LITIGATION.

This document relates to:

Ronald A. Katz Technology Licensing, L.P., Plaintiff,

v.

Continental Airlines, Inc., et al, Defendants.

Case Nos. MDL 2:07–ML–1816–C–RGK (FFMx), CV–07–4965–RGK (FFMx).

United States District Court, C.D. California.

Dec. 3, 2010.

Anthony M. Stiegler, Cooley Godward, Kent M. Walker, Law Office of Kent M. Walker, San Diego, CA, Clyde Moody Siebman, Siebman Reynolds Burg and Phillips LLP, Sherman, TX, Stephen C. Neal, Adam M. Pivovar, Lori R. Mason, Lowell D. Mead, Cooley LLP, Palo Alto, CA, Thomas F. Poche, Cooley Godward Kronish, Washington, DC, Frank V. Pietrantonio, Jonathan Garwood Graves, Nathan K. Cummings, Cooley Godward Kronish, Reston, VA, Sarah J. Guske, Wayne Odis Stacy, Cooley Godward Kronish, Broomfield, CO, for Plaintiff.

## ORDER RULING ON THE PARTIES' INDIVIDUAL SUMMARY JUDGMENT MOTIONS

R. GARY KLAUSNER, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION .................................................941

II. JUDICIAL STANDARD .........................................942

III. TELIGENCE'S MOTION FOR SUMMARY JUDGMENT ...................942
 A. Non–Infringement ........................................943
 1. Legal Standard—Non–Infringement ..................943
 2. Claim 11 of the '150 Patent .......................944
 a. Conditionally Interfacing .......................944
 b. Fetching Control Data ...........................944
 3. Claim 1 of the '285 Patent ........................946
 a. Imposed Condition................................946
 b. Operator Format .................................946
 c. Selection Means .................................947
 d. Interconnect Switch Means .......................947
 4. Claim 32 of the '309 Patent, "Designation Number" ......948
 5. Claim 46 of the '309 Patent and Claim 24 of the '707 Patent.............949
 a. Caller Data Signals (both claims) ...............949
 b. Consumable Participation Key (both claims).......950
 c. Predetermined Time (Claim 24 of the '707 Patent) ...............951
 6. Claim 183 of the '863 Patent ......................951
 a. Incrementing/Decrementing Key Numbers ...........952
 b. Processing Answer Data...........................952
 7. Claims 32, 53 and 67 of the '762 Patent............952
 a. Customer Numbers ................................953
 b. Acknowledgment Numbers ..........................953

 8. Claim 24 of the '415 Patent .......................................954
 a. Associated telephone number signals ...........................954
 b. Cues ......................................................955
 c. On–going Accounting Data....................................955
 9. Doctrine of Equivalents .......................................955
 B. Invalidity, Obviousness ............................................956
 1. Claim 24 of the '415 Patent ....................................956
 a. Legal Standard ............................................956
 b. The References ............................................956
 i. First Hawaiian ........................................956
 ii. Friedes ..............................................957
 c. Combination of First Hawaiian and Friedes ......................957
 2. Claim 32 of the '309 Patent ....................................958
 a. The References ............................................958
 i. Levine ...............................................958
 ii. Trice ................................................958
 b. Motivation to Combine .....................................959
 C. Invalidity, Indefiniteness...........................................959
 1. Legal Standard ...............................................959
 2. Qualification Structure ........................................960
 3. "Consumable Participation Key" ...............................960
 D. Laches ..........................................................961
 1. Legal Standard ...............................................961
 2. Unreasonable Delay ...........................................961
 3. Prejudice.....................................................963

IV. KATZ'S CROSS MOTION FOR SUMMARY JUDGMENT ...................963
 A. Equitable Estoppel.................................................963
 1. Misleading Conduct............................................964
 B. Prosecution Laches ...............................................964
 1. Legal Standard—Prosecution Laches ...........................964
 2. Intervening Rights ............................................964
 3. Unreasonable Delay ...........................................964

V. SUMMARY ...............................................................965

## I. INTRODUCTION

In approximately fifty different lawsuits, plaintiff Ronald A. Katz Technology Licensing, L.P. ("Katz") has alleged that various defendants infringe claims from its family of related interactive call processing patents. The Judicial Panel on Multidistrict Litigation consolidated these cases for pretrial proceedings and transferred the consolidated case to this Court (07–MDL–1816). This Court grouped the different cases based roughly on the date they were transferred. The current case is part of the Group C cases.

In managing the Group C cases, this Court ordered Katz to eventually limit the number of claims it was asserting against each defendant group to sixteen. This Court has already ruled on various joint summary judgment motions filed by the Group C defendants and found that a number of the asserted claims were invalid as obvious under 35 U.S.C. § 103 or invalid for lack of written description and/or indefinite under 35 U.S.C. § 112.

The sixteen claims Katz asserts against defendants Teligence (US), Inc., Teligence Holdings (US), Inc. and UTel Networks, Inc. (collectively, "Teligence") are: claim 10 of U.S. Patent No. 4,930,150 ("the '150 patent"); claim 1 of U.S. Patent No. 5,351,-285 ("the '285 patent"); claims 32 and 46 of U.S. Patent No. 5,255,309 ("the '309 patent"); claim 24 of U.S. Patent No. 5,561,707 ("the '707 patent"); claim 183 of

U.S. Patent No. 5,684,863 ("the '863 patent"); claim 24 of U.S. Patent No. 6,512,-415 ("the '415 patent"); claims 53 and 67 of U.S. Patent No. 5,898,762 ("the 762 patent"); claims 31, 53, 63, 66 of U.S. Patent No. 6,335,965 ("the '965 patent"); and claims 57 and 67 of U.S. Patent No. 5,974,120 ("the '120 patent"). Both parties have moved for summary judgment.

Teligence's motion for summary judgment covers four sets of issues. First, Teligence moves for summary judgment of non-infringement raising a number of different non-infringement arguments. Second, Teligence asks the court to find claim 24 of the '415 patent and claim 32 of the '309 patent invalid as obvious under 35 U.S.C. § 102/103. Teligence also asks the court to find claims 32 and 46 of the '309 patent, claim 24 of the '707 patent, and claim 11 of the '150 patent invalid as indefinite under 35 U.S.C. § 112. Finally, Teligence moves for summary judgment asking the Court to rule that laches applies.

Katz moves for summary judgment on Teligence's affirmative defenses of equitable estoppel and prosecution laches.

## II. JUDICIAL STANDARD

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Karlin Tech., Inc. v. Surgical Dynamics, Inc.,* 177 F.3d 968, 970 (Fed.Cir.1999). A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A party opposing a properly supported motion for summary judgment " 'may not rest upon the mere allegations or denials of his pleading, but

... must set forth specific facts showing that there is a genuine issue for trial.' " *Id.* (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). "If the evidence [opposing summary judgment] is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–250, 106 S.Ct. 2505 (citations omitted).

Even where the movant does not seek judgment as to the whole action, "the court should, to the extent practicable, determine what material facts are not genuinely at issue." Fed.R.Civ.P. 56(d)(1). "It should then issue an order specifying what facts—including items of damages or other relief—are not genuinely at issue." *Id.* Thus, "judgment may be rendered on liability alone...." Fed.R.Civ.P. 56(d)(2).

## III. TELIGENCE'S MOTION FOR SUMMARY JUDGMENT

The accused Teligence system provides membership-based telephone social networking services with chatlines and mailboxes accessible by telephone, where male and female members of the service can interact for the purpose of dating. Multiple dating brands are offered on the system.

There are two types of membership in the Teligence system: paid and free (or promotional). As an inducement to participate in the system, male customers initially receive free memberships. After a period of free usage, which can be renewed under various circumstances, male members who desire to continue using the service pay for their memberships. Paid memberships are renewable an indefinite number of times. All membership accounts in the system have associated with them membership minutes that determine how long a member can stay connected to the system content (*i.e.,* the system chat-

lines and/or mailboxes) before having to request more free minutes or, at some point, purchase new minutes. Female customers do not need memberships because they can use the Teligence service for free at all times.

A male customer seeking to access a particular Teligence brand dials a local or 1–800 number associated with that brand, enters his membership number, and is connected to the brand "content." This "content" includes (1) the brand chatline, (2) a mailbox set up by the customer from which the customer, after entering a mailbox number and PIN, can retrieve messages left by female callers, or (3) female customer mailboxes in which the male customer can leave messages.

A small portion of Teligence's business is carried out on a pay-per-call basis (*i.e.*, the call is charged by the minute) rather than on a pre-paid membership basis, using 1–900, 1–800 pay-by-credit card or collect-callback mechanisms.

## A. Non–Infringement

Teligence raises numerous different non-infringement arguments. This decision groups the arguments roughly by claim number: 1) claim 11 of the '150 patent, 2) claim 1 of the '285 patent, 3) claim 32 of the '309 patent, 4) claim 46 of the '309 patent and claim 24 of the '707 patent, 5) claim 183 of the '863 patent, 6) claims 32, 53 and 67 of the '762 patent, and 7) claim 24 of the '415 patent.

This Court's January 29, 2010 Order Granting in Part and Denying in Part Defendants' Joint Motion for Summary Judgment of Invalidity Under Sections 102 and 103, 2010 WL 8759131 ("Group C § 102/103 Order") ruled that a number of the claims Katz is asserting against Teligence are invalid. Specifically, the Court found that claim 183 of the '863 patent and claim 67 of the '762 patent were invalid in view of the prior art defendants identified.

Moreover, this Court found that Katz was collaterally estopped from asserting claims 31, 53, and 66 of the '965 patent based on this Court's invalidity findings in the Group B case. Nonetheless, in the interest of efficiency, this Court will rule on the parties' individual non-infringement arguments so that any potential appeal may address all these issues together.

### 1. Legal Standard—Non–Infringement

Under the Patent Act, 35 U.S.C. § 271, liability for patent infringement may be imposed on any person who, without permission of the patentee, "makes, uses, offers to sell, or sells any patented invention [ ] within the United States or imports into the United States any patented invention during the term of the patent therefore." The rights granted to the patentee are defined by the patent's claims. *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 373, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

■ In determining whether an allegedly infringing device falls within the scope of the claims, a two-step process is used: first, the court must determine as a matter of law the meaning of the particular claim or claims at issue; and second, it must consider whether the accused product infringes one or more of the properly construed claims. *Id.* at 384, 116 S.Ct. 1384; *Allen Eng'g Corp. v. Bartell Indus., Inc.,* 299 F.3d 1336, 1344 (Fed.Cir.2002). The second inquiry is a question of fact, although summary judgment of infringement or non-infringement may nonetheless be appropriate when no genuine dispute of material fact exists. *Irdeto Access, Inc. v. Echostar Satellite Corp.,* 383 F.3d 1295, 1299 (Fed.Cir.2004) (quoting *Bai v. L & L Wings, Inc.,* 160 F.3d 1350, 1353 (Fed.Cir. 1998)).

■ The patentee bears the burden of proving infringement by a preponderance

of the evidence. *Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533, 1535 (Fed.Cir. 1991). This burden can be met by showing that the patent is infringed either literally or under the doctrine of equivalents. *See Linear Tech. Corp. v. Impala Linear Corp.,* 379 F.3d 1311, 1318 (Fed.Cir.2004). To support a finding of literal infringement, the patentee must establish that "every limitation recited in the claim appears in the accused product, i.e., the properly construed claim reads on the accused product exactly." *Jeneric/Pentron, Inc. v. Dillon Co.,* 205 F.3d 1377, 1382 (Fed.Cir. 2000) (citing *Amhil Enters. Ltd. v. Wawa, Inc.,* 81 F.3d 1554, 1562 (Fed.Cir.1996)).

### 2. Claim 11 of the '150 Patent

#### a. Conditionally Interfacing

Claim 11 of the '150 patent requires *"conditionally interfacing* said selected format to a calling terminal under control of said testing of said call data signals" (emphasis added). Katz says that this condition is satisfied because:

> Teligence's accused systems connected the call to the format upon satisfying that the DNIS is configured and active, that the ANI is not invalid, that the ANI has not been blocked before the caller is allowed to connect to the format, that the type of DNIS has been identified by the system to determine which format to connect the caller to.

(Lucantoni Decl. at ¶ 46.)

■ This Court previously interpreted the term "conditionally interfacing" to mean "connecting a call to the selected format once any conditions associated with that format have been satisfied." (Claim Construction Order at p. 47.) Teligence's motion for summary judgment points out that ANI/DNIS checks were performed after the caller was already connected to a particular Teligence brand (which Teligence says corresponds to a format).

Thus, Teligence concludes that its systems did not impose conditions to connect with a format. In contrast, Katz argues that a format did not begin until after the system performed the various ANI and DNIS tests. (Lucantoni Decl. at ¶ 50.) Thus, Katz concludes that these tests conditionally interfaced the format.

This Court does not need to determine when the format began to resolve this issue. In ruling on the Group B individual summary judgment motions, this Court determined that the specification of the '150 patent describes initial qualification as conditionally interfacing with a format. (August 13, 2009 Order Ruling on the Parties' Individual Summary Judgment Motions at pp. 61–62, DE 6718, 2009 WL 8635982.) Specifically, the '150 patent specification states that "the voice generator may be variously used to *prompt or inform* callers in *certain preliminary selection operations* supplemental to the specific operations described below." *See* '150 patent at 10:31–34 (emphasis added.) This indicates that "conditionally interfacing" does not have to occur before a caller is connected to a format. The conditional interfacing limitation may be satisfied by preliminary qualification steps. Although ANI and DNIS signals were tested after a format had begun, that fact does not mean that the accused systems did not satisfy the "conditionally interfacing" limitation. Accordingly, this Court DENIES Teligence's motion for summary judgment as it relates to whether the accused systems satisfy the "conditionally interfacing" limitation.

#### b. Fetching Control Data

Claim 11 of the '150 patent also requires:

> ... the step of fetching *control data* addressable with said call data for use in the step of testing

(emphasis added).

■ Katz says that Teligence's system fetched control data when:

... the IVR "hubs" check to insure that a DNIS is configured and active, when the system determines the type of DNIS for a particular caller, when the system performs ANI checks against blocking instructions stored in the ANI.DBF database, and when the system tests whether the caller's ANI is new or old. (Lucantoni Decl. at ¶ 56 (footnotes omitted).)

Teligence does not dispute that its systems performed these functions. However, its motion for summary judgment argues that "control data" means "an associated set of data which contains command bits for specifying conditions, condition parameters, and a format code for specifying the type of format to use when the conditions are satisfied." Teligence also argues that "fetching control data addressable with said call data" means "obtaining data from a control word addressed by the called number (DNIS) for use in imposing the conditions for interfacing the selected format with the caller's telephone." Under these definitions, Teligence says that the functions Katz identified do not fetch control data as required by claim 11.

In response, Katz says "control data" is a straightforward term and that a person of ordinary skill in the art would understand it to have its plain and customary meaning. In this case, Katz suggests "data used for control." This Court addressed the meaning of "control data" when ruling on one of the Group B summary judgment motions. In *Ronald A. Katz Technology Licensing LP v. Earth-Link, Inc.* (07–CV–2325–RGK (FFMx)), EarthLink argued that "fetching control data addressable with said call data for use in the step of testing" meant "retrieving preset data specifying the condition associated with a select format." (May 1, 2009 Order Ruling Parties' Individual Summary Judgment Motions, DE 6333 at p. 14, 2009 WL 8636001.)

To resolve this dispute, this Court looked to the relevant portions of the '150 patent specification. The '150 patent specification does not use the term "control data," but it does describe control words.

[A] control word is fetched under command of the called number as indicated by the block 36. As described in detail below, a control word is available for each operating format of the processor P and is used to impose the conditions for an interface and the terms of any associated billing.

As indicated in Fig. 2, the fetched control word of the block 36 prompts an inquiry as to the conditions attendant the selected operating format....

'150 patent at 5:19–28.

The specification goes on to say that "each of the operating formats has a control word for defining any access conditions or limitations to interface the format...." *Id.* at 7:16–18. These passages demonstrate that the '150 patent is not simply referring to "control data" or "control words" in a generic sense. Thus, this Court rejects Katz's plain meaning construction. The specification uses "control words" to refer to a category of data used to define access conditions or limitations to interface the format. Accordingly, this Court defined the term "control data" in claim 11 of the '150 patent to mean "data that defines access conditions or limitations to interface the format." (May 1, 2009 Order Ruling Parties' Individual Summary Judgment Motions, DE 6333 at p. 15.)

Since this Court previously defined "call data signals" as "signals identifying the called number, the calling number, and/or an equipment type designation" (February 21, 2008 Claim Construction Order at pp. 48–49, 2008 WL 4952454), there is no need

to further define "fetching control data addressable with said call data." The jury can determine the meaning of this phrase from the definitions of its two parts.

Of course, Teligence's motion for summary judgment relies on narrower definitions. With the broader definitions in mind, this Court is unable to find that Teligence's systems did not fetch control data. Rather, this issue is left to the jury to decide. Accordingly, this Court DENIES Teligence's summary judgment motion of non-infringement as it relates to fetching control data.

### 3. Claim 1 of the '285 Patent
#### a. Imposed Condition

Claim 1 of the '285 patent requires a: *selection means* ... for selecting one of said formats under control of said call data including DNIS to thereby further specify imposed conditions that must exist for a connection of a call either to said multiple port, multiple format processor or *one of said live operator stations* in accordance with said select one of said formats, *at least one of said formats having at least one imposed condition.*

(emphasis added.)

■ Teligence points out that the selection means in claim 1 also requires conditions for interfacing a caller to a selected format. Teligence once again argues that the accused systems connected callers to a particular format without any conditions. Therefore, Teligence concludes that there is no infringement. This argument is substantially the same as the arguments Teligence raised for the conditionally interfacing limitation above. The imposed conditions of claim 1 do not have to occur before a caller is connected to a format. *See* '285 patent at 3:30–34. They can occur as part of the preliminary qualification process. Accordingly, this Court DENIES Teligence's motion for summary judgment as it relates to whether the accused systems satisfy the "imposed condition" limitation.

#### b. Operator Format

■ The selection means of claim 1 of the '285 patent requires "specify[ing] imposed conditions that must exist for a connection of a call either to said multiple port, multiple format processor *or one of said live operator stations.*" (emphasis added.) Teligence argues that its systems had no "format" or "brand" for connecting a customer to an operator based on DNIS. Rather, a caller was provided only the option of connecting to an operator after the caller had already been connected to a brand. In other words, Teligence interprets the further imposed conditions of claim 1 to determine whether a call is connected to a multiple port, multiple format processor *format* or a live operator *format.*

This Court rejects Teligence's claim interpretation. The further conditions do not necessarily specify connections for different formats, but to a type of processor or a live operator station. This interpretation is consistent with the specification, which describes classes of formats. '285 Patent at 5:10–20. One class connects a caller to a live operator if certain criteria are met or to a processor if they are not. Another class describes connecting a caller to a processor then re-coupling the caller to a live operator. Thus, the '285 patent specification discloses conditions for connecting to either a processor or an operator. Based on the foregoing, this Court DENIES Teligence's motion for summary judgment to the extent that it interprets claim 1 of the '285 patent to require connection to either a processor *format* or an operator *format.*

#### c. Selection Means

■ As recited above, claim 1 of the '285 patent requires a "selection means." Both parties agree that the "selection means" is a means plus function limitation governed by 35 U.S.C. 112 ¶ 6. The construction of a means plus function limitation follows a two-step approach. First, the claimed function must be identified. Next, the corresponding structures in the written description that perform those functions must be ascertained. *Omega Engineering Inc. v. Raytek Corp.* 334 F.3d 1314, 1321 (Fed.Cir.2003).

Although the parties identify slightly different functions, they both rely on *Verizon California, Inc. v. RAKTL*, 326 F.Supp.2d 1060, 1088–89 (C.D.Cal.2003), to say that the structures that perform the recited function are the "control unit 66 (including software to perform the claimed function), control register 70, and look-up table 84." The dispute centers on the next step of the means plus function analysis. Teligence argues that the structure must also include specific algorithms disclosed by the '285 patent and concludes that its systems did not have anything comparable to those algorithms. Katz argues the proper interpretation of the selection means does not include any algorithms.

Under *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed.Cir.1999), when a means plus function limitation discloses a computer or microprocessor programmed to carry out an algorithm as the corresponding structure, "the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm." Thus, this issue is whether the structures that perform the function recited by the "selection means" comprise a general purpose computer.

■ The Court addressed this very issue earlier in the Group C cases. The Court ruled that the *WMS Gaming* rule does not apply to the "selection means" because the control unit is not a general purpose computer and because other structures play substantial roles in performing the recited function. (October 13, 2009 Order Denying Joint Motion for Invalidity Under Section 112 at p. 21, 2009 WL 8636052.) Based on the foregoing, this Court DENIES Teligence's motion for summary judgment because the proper interpretation of "selection means" in claim 1 of the '285 patent does not include algorithms.

#### d. Interconnect Switch Means

Claim 1 also requires an interconnect switch means as recited below.

> *interconnect* switch means for providing format data and controlling connections from a calling remote terminal to a port of said *multiple port, multiple format* processor or one of said live operator stations under control of said selection means.

■ Teligence argues that the "interconnect switch means" limitation is also a means plus function limitation governed by 35 U.S.C. 112 ¶ 6. Citing to this Court's earlier ruling in the *Verizon* case, Katz challenges this characterization.

■ Where a claim uses the word "means" to describe a limitation, it is presumed that 35 U.S.C. § 112 ¶ 6 applies. However, this presumption can be rebutted when the claim also recites structure sufficient to perform the claimed function in its entirety. *See Altiris Inc. v. Symantec Corp.*, 318 F.3d 1363, 1375 (Fed.Cir. 2003). In an earlier case involving the same patents, this Court found that the term "switch" provided sufficient structure for performing the recited function of "providing format data" and "controlling connections." *Verizon California*, 326 F.Supp.2d at 1089. Here, without any evidentiary support, Teligence asserts that

the recited functions are above and beyond those of a mere switch. In contrast, Katz's expert, Dr. Lucantoni, says that a person of ordinary skill in the art would understand a "switch to include a broad range of structures having switching capability" and would be used to perform the function of providing format data and controlling connections from a calling remote terminal to a port. (Lucantoni Decl. at ¶ 101.) Thus, the only evidence before the Court is Dr. Lucantoni's expert testimony. He concludes that a switch does provide sufficient structure to perform the functions even as identified by Teligence.

Accordingly, this Court finds that a switch provides sufficient structure to take the interconnect switch means outside the scope of 35 U.S.C. § 112 ¶ 6. Since Teligence's non-infringement analysis relies on construing the interconnect switch means as a means plus function limitation governed by *WMS Gaming*, this Court DENIES Teligence's motion for summary judgment as it relates to the "interconnect switch means" limitation.

### 4. Claim 32 of the '309 Patent, "Designation Number"

■ Claim 32 of the '309 patent recites an analysis control system for use with a communication facility. The system includes a designation structure limitation. Teligence cites to *CCS Fitness v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed.Cir. 2002) and asserts that the designation structure is a means plus function limitation governed by 35 U.S.C. § 112 ¶ 6. When means plus function language is not used, there is a rebuttable presumption that § 112 ¶ 6 does not apply. *Id.* That presumption can be rebutted by showing

that the claim term fails to "recite sufficiently definite structure" or else recites a "function without reciting sufficient structure for performing that function." *CCS Fitness*, 288 F.3d at 1369 (citation omitted). Here, the relevant portion of claim 32 recites:

> designation structure coupled to said interface structure and said record structure for assigning individual designations to said individual callers and storing said designations in said record structure.

■ Thus, the issue is whether the "designation structure" is sufficient to perform the assigning function. Oddly, Teligence never addresses this crucial issue. In contrast, Katz's expert, Dr. Lucantoni, says that a "designation structure" connotes a definite structure to a person of ordinary skill in the art. (Lucantoni Decl. at ¶ 146.) Specifically, he says that it refers to "hardware and/or software for assigning and storing a caller designation." *Id.* Although Teligence disagrees with Dr. Lucantoni's conclusion, it presents no contrary evidence. At most, Teligence cites to some testimony that casts some doubt on the reliability of Dr. Lucantoni's conclusion. (Lucantoni Dep. at 95:10–16, Ex. 19 to Caridis Decl.) Given this record, this Court has no choice but to find that the designation structure is not a means plus function limitation governed by § 112 ¶ 6.

Since Teligence's non-infringement analysis relies on construing the designation structure as a means plus function limitation, this Court DENIES Teligence's motion for summary judgment as it relates to the "designation structure" limitation.[1]

---

1. Teligence's Statement of Uncontroverted Facts at ¶ 37 suggests that the "record structure" of claim 32 of the '309 patent is also governed by § 112 ¶ 6. However, this suggestion does not appear in the main memorandum and the argument was so undeveloped that this Court can only reject the argument for failure to satisfy Teligence's burden of proof.

**5. Claim 46 of the '309 Patent and Claim 24 of the '707 Patent**

Katz says that Teligence infringed claim 46 of the '309 patent and claim 24 of the '707 patent because of its promotional memberships. Teligence issued promotional (or free) membership numbers that expired after 30 minutes of use or seven days. Once a caller consumed the promotional time, the system prohibited the caller from further access to the parts of Teligence services that required minutes. Claims 46 and 24 are recited in the two columns below.

46. A control system for use with a communication facility including remote terminals for individual callers, wherein each of said remote terminals may comprise a conventional telephone instrument including voice communication means, and digital input means in the form of an array of alphabetic numeric buttons for providing data, said control system comprising:

an interface structure coupled to said communication facility to interface said remote terminals for voice and digital communication, and including means to provide caller data signals representative of data relating to said individual callers developed by said remote terminals;

voice generator structure coupled through said interface structure for actuating said remote terminals as to provide vocal operating instructions to said individual callers;

record structure, including memory and control means, connected to receive said caller data signals from said interface structure for updating a file and storing digital caller data relating to said individual callers provided from said digital input means through said interface structure; and

qualification structure controlled by said record structure for testing caller data signals provided by a respective one of said individual callers to specify a consumable participation key for restricting the extent of access to said system to limit data stored from said respective one of said individual callers on the basis of entitlement (emphasis added).

24. An analysis control system for use with a communication facility including remote terminals for individual callers, wherein each of said remote terminals may comprise a conventional telephone instrument including voice communication means, and digital input means in the form of an array of alphabetic numeric buttons for providing data, said analysis control system comprising:

an interface structure coupled to said communication facility to interface said remote terminals for voice and digital communication, and including means to provide caller data signals representative of data relating to said individual callers developed by said remote terminals;

voice generator structure coupled through said interface structure for actuating said remote terminals as to provide voice operating instructions to said individual callers;

record structure, including memory and control means, connected to receive said caller data signals from said interface structure for accessing a file and storing digital caller data relating to said individual callers provided from said digital input means through said interface structure; and

qualification structure for operation at a predetermined time for testing caller data signals provided by at least one of said individual callers to specify a consumable participation key for restricting the extent of access to at least a portion of said system by said one of said individual callers on the basis of entitlement (emphasis added).

Teligence argues that it does not infringe these claims for a number of different reasons.

**a. Caller Data Signals (Both Claims)**

■ Both claim 46 of the '309 patent and claim 24 of the '707 patent require an interface structure that includes means to provide "caller data signals." Katz's expert, Dr. Lucantoni, identifies several examples of caller data signals: when the caller entered a membership number, passcode, mailbox number, mailbox passcode,

credit card related information, or system navigational entries. (Lucantoni Decl. at ¶ 161.)

Teligence's motion for summary judgment interprets the term "caller data signals" more narrowly. Teligence says that the term refers to "signals representing data, *including a caller's telephone number,* that is developed by the caller's telephone and is related to the caller." (Teligence's Mot for Summ. J. at p. 12 (emphasis added).) Relying on this claim construction, Teligence concludes that Katz's examples do not satisfy the caller data signals limitation.

In support of its claim construction, Teligence points out that the specification of the '309 patent states that the "interface 20 can accept the calling number ... according to its provision by standard ANI equipment of the communication facility C." '309 patent at 7:5–8. In response, Dr. Lucantoni argues that this interpretation is inconsistent with the specification, which says that the invention could be operated "if the ANI equipment is not employed." '309 patent at 6:65–7:2. Instead, Dr. Lucantoni says that the "caller data signals" merely refers to "signals containing data related to a caller." (Lucantoni Decl. at ¶ 165.)

Once again this dispute requires the Court to walk the fine line of using the specification to interpret the meaning of a claim without importing limitations from the specification into the claim. *See Phillips v. AWH*, 415 F.3d 1303, 1323 (Fed.Cir. 2005) (*en banc*). In this Court's judgment, there is nothing within the specification or the term itself that requires caller data signals to include a caller's telephone number. Accordingly, this Court rejects Teligence's claim construction. Instead, this Court finds that the "caller data signals" refer to signals containing data related to a caller.

Accordingly, this Court DENIES Teligence's motion for summary judgment as it relates to whether the "caller data signals" limitation is satisfied. This Court also rejects the two following related claim interpretations: 1) that the "record structure" must receive the caller data, and set up a memory cell based on the caller's telephone number, and 2) that the qualification structure must test customer ANI's to specify membership minutes.

### b. Consumable Participation Key (Both Claims)

Claim 46 also requires a qualification structure to specify a consumable participation key for restricting the extent of access. Katz argues that the promotional membership number is a consumable participation key. This Court previously defined a consumable participation key as "a number or word that allows a caller access to a service or part of a service a predefined limited number of times and which cannot be refreshed or recharged." (February 21, 2008 Claim Construction Order at p. 19.) Katz says that the promotional membership number satisfies this definition because the minutes associated with that membership number could not be refreshed or recharged.

Teligence's summary judgment argues that the promotional number does not qualify as a consumable participation key for two reasons. First, Teligence points out that once a male customer's minutes ran out, the minutes could be recharged through the Teligence IVR or by an operator at the customer's request. With respect to recharging through the IVR, the record shows that the customer received a new membership number. (Snider Dep. at 170:9–23 attached as Ex. 23 to Walker Decl.) Thus, these facts do not show that the promotional number is recharged. With respect to the operator's ability to recharge a promotional number, Dr. Lu-

cantoni argues that the operator was overriding the default settings of the IVR system. (Lucantoni Decl., at ¶ 192.) This issue presents a triable issue for the jury that cannot be resolved on summary judgment.

Teligence also points out that even when a customer has run out of minutes, he can still access part of the system without limitation. However, the Court's definition says that a consumable participation key can allow access to part of the system. The fact that the key does not restrict access to different parts of the system is immaterial.

Accordingly, this Court DENIES Teligence's motion for summary judgment as it relates to whether the "consumable participation key" limitation is satisfied.

### c. Predetermined Time (Claim 24 of the '707 Patent)

■■■ Claim 24 states that the qualification structure is for operation "at a predetermined time." Teligence's motion for summary judgment argues that caller data is not tested during a predetermined time interval to specify a non-refreshable or non-rechargeable number or word that allows the customer access to a service or part of a service for a predefined limited number of times. (Snider Rebuttal Report, ¶ 43 attached as Ex. A to Snider Decl.) However, Teligence's motion does not address Katz's allegations. Katz says that Teligence satisfies this limitation because the qualification structure operated at a specific time interval, for example within 30 seconds of a prompt, during a promotional hour, or at a specific step in the call flow. (Lucantoni Decl. at ¶ 226.)

Given this minimal record, this Court finds that Teligence has failed to satisfy its burden of proof and DENIES Teligence's motion for summary judgment as it relates to whether the "predetermined time" limitation is satisfied.

### 6. Claim 183 of the '863 Patent

Katz says that Teligence infringed claim 183 of the '863 patent based on the way its IVR systems used membership numbers to allow access to the system. Claim 183 of the '863 patent depends from independent claim 181. Together the claims recite:

181. A process for controlling operations of an interface with a telephone communication system, said process including the steps of:

providing *key numbers specifying limits on use* to entitle individual callers to access said operations of the interface with said telephone communication system;

coupling remote terminals to said interface for providing voice signals to said individual callers and generating said voice signals for actuating said remote terminals as to provide vocal operating instructions to specific ones of said individual callers;

receiving said key numbers as digital identification data from said individual callers responsive to said voice signals and answer data provided from said remote terminals under control of said individual callers;

qualifying said individual callers by testing to determine if said individual callers are entitled to access said operations of the interface by testing said key numbers for said individual callers against stored key numbers to ensure their validity and testing said key numbers based on said limits on use for said individual callers and accordingly providing approval signals for qualified individual callers;

accessing a memory with said key numbers for said individual callers and storing data relating to calls from said individual callers; and

*processing at least certain of said answer data responsive to said approval signals.*

183. A process for controlling operations of an interface with a telephone communication system according to claim 181, wherein certain of said voice signals provided to said individual callers indicate computer generated number data formed during operations of said interface

(emphasis added).

### a. Incrementing/Decrementing Key Numbers

■ Claim 183 requires the use of "key numbers" to specify limits on use. Katz says that Teligence membership numbers and mailbox numbers are key numbers that entitle callers to access operations of the interface based on limits on use. Teligence asserts that these numbers do not satisfy the key number limitation because a "key number" must be incremented or decremented. But, as Teligence acknowledges, this Court previously refused to adopt this very interpretation. Specifically, the Court found that "neither the specification nor the file history supports [an interpretation]" that a "key number" means "a number that is ... incremented or decremented based on use." (February 21, 2008 Claim Construction Order at p. 36). Teligence's motion fails to raise any new arguments and this Court declines to change its interpretation of "key numbers."

Since Teligence's non-infringement argument relies on a rejected claim interpretation, this Court DENIES Teligence's motion for summary judgment as it relates to whether the "key numbers" limitation is satisfied.

### b. Processing Answer Data

Claim 183 also requires "processing at least certain of said answer data responsive to said approval signals." Katz says that the Teligence system received and processed answer data in numerous ways (*e.g.*, processing of passcode, credit card information, and other answer data). Teligence argues that these examples do not satisfy the processing limitation because the phrase means:

> manipulating the answers of individual callers, in response to the approval signals, the manipulation including interrelating answer data with or without external data and using time or sequence to accomplish a subset of callers.

(Teligence's Mot. for Summ. J. at p. 18.)

■ In support of its interpretation, Teligence argues that the only manipulations described by the '863 patent are those interrelating answers in this specific manner described above. However, this Court must not impermissibly import limitations from the specification. *See Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1379 (Fed.Cir.2005). Here, the plain language of the processing limitation does not suggest the narrower interpretation Teligence advances. Moreover, Teligence has failed to point to any other evidence suggesting that the claim language should be limited in this manner. Accordingly, this Court rejects the additional limitations Teligence would import. Since Teligence's non-infringement argument relies on this claim interpretation, this Court DENIES Teligence's motion for summary judgment as it relates to whether the "processing ... approval signals" limitation is satisfied.

### 7. Claims 32, 53 and 67 of the '762 Patent

Katz says that Teligence infringed claims 32, 53 and 67 of the '762 patent. The focus of the parties' dispute is on whether the accused systems had the "customer numbers" and "acknowledgement numbers" required by the claims.

### a. Customer Numbers

All three claims require "customer numbers." Although claim 32 is dependent on independent claim 17, and claims 53 and 67 are dependent on independent claim 41, they all contain the same relevant claim language:

... interface structure coupled to said communication facility to interface said remote terminals for voice and digital communication and including means to provide answer data signals provided by said individual callers from said remote terminals including *signals indicative of an individual caller's customer number* and credit card number;

credit verification structure *to verify said individual caller's customer number* and credit card number to determine said individual caller's credit.

(emphasis added).

■■■ This Court previously defined a "customer number" as "a number assigned to a customer by a vendor or merchant or recognized by a vendor or merchant for the purpose of identification of the customer." (February 21, 2008 Claim Construction Order at pp. 26–27). Katz says that Teligence's membership numbers were used as customer numbers to identify Teligence customers for various purposes, such as tracking their accounts and minutes and collecting money.

Teligence's motion for summary judgment argues that its membership members are not customer numbers because they do not uniquely identify Teligence customers. Teligence points out that a single customer can have multiple membership numbers if he subscribes to multiple brands. In response, Katz argues that there is no requirement that a customer number *uniquely* identify the customer. This Court agrees with Katz and finds that a reasonable juror could conclude that Teligence's membership numbers are customer numbers as required by claims 32, 53

and 67 of the '762 patent. Accordingly, this Court DENIES Teligence's motion for summary judgment as it relates to whether the "customer number" limitation is satisfied.

### b. Acknowledgement Numbers

Claims 32, 53 and 67 of the '762 patent all require generating an "acknowledgment number." The following limitation is found in each of these three claims:

... acknowledgement generator structure for providing a computer generated *acknowledgement number* to said individual callers.

(emphasis added).

■■■ This Court previously defined an "acknowledgement number" as "a number that is used by a caller to verify or acknowledge a transaction to the system." (February 21, 2008 Claim Construction Order at p. 8) Katz argues that membership numbers and pass codes provided by Teligence are the acknowledgement numbers required by the claims.

Teligence's motion for summary judgment argues that these numbers are not acknowledgement numbers because they do not serve to verify transactions (*e.g.* leaving messages in mailboxes, purchasing or obtaining membership minutes, or talking with operators.) In response, Teligence says that the membership numbers and pass codes serve as acknowledgment numbers in one type of transaction—when a customer signs up to establish a membership with Teligence. In that transaction, the Teligence system provides the membership number and passcodes.

Teligence argues that this infringement analysis is specious because it would mean that any account number would be an acknowledgment number because it would signify that a caller has opened up an account. Although Teligence does not properly articulate why an acknowledg-

ment number should be read more narrowly, this Court finds alternative grounds for doing so. Claims 32, 53 and 67 of the '762 patent separately require both a customer number and an acknowledgment number. The specification of the '762 patent likewise describes these concepts separately. *See, e.g.,* Figure 5 of the '762 patent. Thus, we conclude that the two terms refer to different structures. *See Applied Medical Resources Corp. v. U.S. Surgical Corp.,* 448 F.3d 1324, 1333 fn. 3 (Fed.Cir.2006) ("The prosecution history, specification, comparison with other claims in the patent, and other evidence may require that two terms in a claim refer to different structures . . . ." (citation omitted)). With that understanding of the claim terms in mind, this Court finds that Teligence's membership number is not an acknowledgment number.

■■■ This Court also finds that a reasonable juror could not conclude that a passcode is provided by the system to verify or acknowledge a transaction. A passcode is clearly provided so that the system may verify the identity of the caller in future transactions, not so that the caller can verify that the current transaction took place. Accordingly, this Court GRANTS Teligence's motion for summary judgment and finds that it does not infringe claims 32, 53 and 67 of the '762 patent because the accused systems did not generate an "acknowledgment number."

### 8. Claim 24 of the '415 Patent

■■■ Katz says that Teligence infringed claim 24 of the '415 patent because of various accounting features that its system included. Claim 24 of the '415 patent depends from independent claim 20. Together the claims recite:

20. A method for determining the acceptability of calls and executing certain operations of telephonic formats in association with a communication facility including remote terminal apparatus for the individual callers, wherein said remote terminal apparatus includes a telephonic instrument with voice communication means and digital input means in the form of an array of alphabetic, numeric buttons for providing data, including the steps of:

receiving *associated telephone number signals* automatically provided by the communication facility upon the instance of a call from one of said remote terminal apparatus;

testing said *associated telephone number signals* with respect to stored data to determine the acceptability of said call from said one of said remote terminal apparatus; and

selectively providing one or more cues to said one of said remote terminal apparatus and *providing at least one cue depending upon the associated telephone number signals* for said call from said one of said remote terminal apparatus in accordance with a select format.

24. A method according to claim 20, wherein at least one cue indicates *ongoing accounting data* during said call.

(emphasis added).

Teligence points out that its systems did not have any brand specific prompts that depended on testing the caller's ANI. Its systems also did not prompt the customer with an indication of how many points the customer has accumulated. Teligence argues that these features take its systems outside the scope of claim 24. Katz challenges Teligence's claim construction (and various facts).

#### a. Associated Telephone Number Signals

Teligence appears to interpret the term "associated telephone number signals" to be limited to ANI signals. Teligence ar-

gues that the '415 patent teaches only one type of testing to determine whether to accept or reject a call. However, Katz points out that the specification teaches that both ANI and DNIS could be utilized to determine call acceptance. '415 patent at 4:58–59. This is consistent with this Court's earlier rulings. (*See* August 13, 2009 Order Ruling on the Parties' Individual Summary Judgment Motions at pp. 80–81 (DE 6718) (holding that the step of testing associated telephone number signals could be satisfied by testing ANI *or* DNIS signals.)) Thus, this Court rejects Teligence's claim interpretation and finds that "associated telephone number signals" can refer to either ANI or DNIS signals.

### b. Cues

Teligence also interprets the term "providing at least one cue" to mean "providing a caller with a question or prompt *being specific to a game format.*" The additional language Teligence proposes is not reflected in the claim language nor does Teligence explain why a cue must be limited to a game format cue. Thus, this Court declines to revise its previous definition where it construed "cue" as "a question or prompt which is given to a caller." (February 21, 2008 Claim Construction Order at p. 57)

### c. On-going Accounting Data

Teligence also interprets the term "on-going accounting data" to indicate how many points the caller has accumulated in response to questions asked of the caller during a call. As with Teligence's "game format" contention, there is no basis for linking the "on-going accounting data" limitation with a definition that describes "points." The specification discloses an example of on-going accounting data, it does not describe its limits. Indeed, the Eastern District of Pennsylvania rejected a similar attempt to limit the meaning of "accounting data" to "scores in a television game show format." (*Ronald A. Katz*

*Technology Licensing L.P., et al. v. AT & T Corp., et al.,* 63 F.Supp.2d 583 (E.D.PA. 1999) Claim Construction Order at pp. 74–75 attached as Ex. 3 to Walker Decl.)

Since Teligence's non-infringement arguments depend on the three rejected claim constructions that it offered, this Court DENIES Teligence's motion for summary judgment as it relates to claim 24 of the '415 patent.

### 9. Doctrine of Equivalents

■ Katz asserts 16 claims against Teligence, alleging infringement under the doctrine of equivalents in each case. Teligence argues that Katz's technical expert, Dr. Lucantoni, fails to provide particularized evidence linking any of the asserted claims to the Teligence system under the doctrine of equivalents. Where a patentee does not provide particularized testimony specifically showing that the accused system performs the same function, in the same way, and achieves the same result as the patent-in-suit, a grant of a motion for summary judgment of non-infringement under the doctrine of equivalents is proper. *Motionless Keyboard Co. v. Microsoft Corp.,* 486 F.3d 1376, 1383 (Fed.Cir.2007).

■ Teligence says that Dr. Lucantoni wholly fails to address the doctrine of equivalents with respect to nine of the asserted claims (claim 11 of the '150 patent, claim 163 of the '863 patent, claims 57 and 67 of the '120 patent, claims 31, 53, 63 and 66 of the '965 patent and claim 24 of the '415 patent) and analyzes only a handful of limitations under the doctrine with respect to the remaining claims. In support of these arguments, Teligence's brief cites to "Attachment A" while its Statement of Genuine Issues cites to "Attachment B pp. [sic]" These citations are unhelpful because Teligence includes more than one set of attachments with letters to various declarations it included with its

summary judgment papers. In addition, a cursory review of the Snider and Onyeama attachments are unhelpful. Thus, this Court is unable to properly assess the merits of Teligence's arguments.

Based on the foregoing, this Court finds that Teligence has failed to satisfy its burden of proof and DENIES Teligence's motion for summary judgment as it relates to the issue of infringement under the doctrine of equivalents.

## B. Invalidity, Obviousness

### 1. Claim 24 of the '415 Patent

Teligence argues that claim 24 of the '415 patent[2] is invalid as obvious under 35 U.S.C. 103 in light of the Periphonics system that was sold to First Hawaiian Bank ("First Hawaiian") in combination with "ISDN Opportunities for Large Business-800 Service Customers" by A. Friedes published in June, 1986 in IEEE-International Conference on Communications '86 ("Friedes").

#### a. Legal Standard

A patent is presumed valid, and the defendants have the burden of proving invalidity by clear and convincing evidence. *See* 35 U.S.C. § 282; *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1320 (Fed.Cir.2004). If the claimed invention is not disclosed in a single prior art reference, a patent may still be invalid as obvious under § 103. In *Graham v. John Deere*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the Supreme Court set forth the test for obviousness:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background the obviousness or nonobviousness of the subject matter is deter-

mined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

*Id.* at 17–18, 86 S.Ct. 684.

This test is a question of law based on underlying factual inquiries. *See, e.g., Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed.Cir.2007).

#### b. The References

##### i. First Hawaiian

Although Katz argues that Teligence has failed to show that First Hawaiian is prior art, Katz has admitted in another brief that First Hawaiian was on sale no later than October 13, 1983 and is thus prior art to the '415 patent under 35 U.S.C. § 102(b). (January 29, 2010 Order Granting in Part and Denying in Part Defendants' Joint Motion for Summary Judgment of Invalidity Under Sections 102 and 103, p. 15 (DE 6946).) Both parties rely on the "Functional Specification for First Hawaiian Bank" to describe the features of the First Hawaiian system. ("FH '83").

First Hawaiian is an automated voice response telephone system that contains two primary applications, "Bank–From–Home" ("BFH") and credit authorization. The BFH application allows a caller to pay bills and check account status. (FH '83 at § 2.1.) To access the BFH application, callers must enter their account number and a secret code. (FH '83 at § 5.4.4.) After the caller has gained access, the caller can make a payment by entering the merchant number, payment amount, invoice number and date. (FH '83 at § 5. 1.) At the termination of a call and the customer payment, the system will provide the caller

---

**2.** Claim 24 is recited in section III(B)(8) above.

with the new account balance. (FH '83 at § 5.3.9.) Under certain circumstances, the application will divert the call to an operator. (FH '83 at § 5.3.)

The credit authorization application allows callers to obtain authorization for a credit card transaction. (FH '83 at § 2.2.) The caller must enter a merchant number, account number, expiration date and amount of sale. (FH '83 at § 6.1.) The system responds in one of three ways: 1) authorizing the transaction and providing an authorization number, 2) declining to authorize the transaction, and 3) referring the call to an operator. *Id.*

### ii. Friedes

The Friedes article discloses Advanced 800 and ISDN features that can be used by telephone customer service organizations such as telemarketing companies to more efficiently handle calls. (Friedes at § 1.) Friedes discloses forwarding the originally dialed number (DNIS) to provide flexibility in managing access to services and facilities. For example, where multiple businesses with different 800 numbers are being served by a single ACD, the identity of the business being called can be determined by the originally dialed number received along with the call. (Friedes at § 5.5.) This allows designating, on a call-by-call basis, what service to provide and customer-specific call-handling instructions to process a call. *Id.* Such ACDs can also be placed at different geographic locations to satisfy the needs of multi-location customers to give increased control of their network services. *Id.*

Friedes further discloses forwarding the calling number (ANI) to allow a record associated with the caller to be retrieved from a database and displayed to an attendant when the voice path is established for more efficient and personalized service. (Friedes at § 5.3.) Additionally, information received from the network (e.g., ANI) and obtained directly from the caller for updating customer information (e.g., via verbal communication with an attendant) can be transmitted along with a call when referring a call to eliminate the need for a caller to repeat the process of providing necessary information. (Friedes at Section 5.4.)

### c. Combination of First Hawaiian and Friedes

■ During the joint summary judgment motion briefings, the parties argued whether there was a motivation to combine First Hawaiian and Friedes. This Court stated that Friedes describes tools and features that were intended to be used in other systems like First Hawaiian, and found that there was a motivation to combine these two references. (January 10, 2010 Order Granting In Part and Denying In Part Defendants' Joint Motion for Invalidity Under Sections 102 and 103 at pp. 25–26, DE 6946.) Thus, the only remaining issue is whether the combination of references discloses all the limitations of claim 24 of the '415 patent. Katz argues that the combination fails to address three limitations.

First, Katz argues that the two references fail to disclose "testing . . . to determine the acceptability of said call." Friedes says that by using ANI, "a validation check could be made to determine whether or not to establish a voice path at all (screening out 'hackers')." (Friedes at Section 3.1.) Teligence argues that this feature discloses to the testing step of claim 24. In response, Katz argues that the testing step only determines the acceptability of a call to an automated interface. Therefore, Friedes does not disclose the testing limitation.

This Court previously defined the testing step to mean "determine if criteria are satisfied to allow access to the system." (February 21, 2008 Claim Construction Order at p. 57.) There is nothing in either

the language of this phrase or this Court's definition that somehow limit this test to automated interfaces. Accordingly, this Court rejects Katz's argument and finds that Friedes discloses the testing limitation.

Second, Katz argues that the combination of First Hawaiian and Friedes does not disclose the step of "providing at least one cue depending upon the associated telephone number signals." Teligence does not dispute this point. Instead, Teligence argues that it would have been obvious in light of Friedes for a person of ordinary skill in the art to modify First Hawaiian to use ANI information to distinguish between bill-paying and non-bill paying callers. However, Friedes does not disclose using ANI information to determine which cues to provide. Moreover, Katz's invalidity expert, Dr. Brody, argues that "[t]o do so would predictably restrict the ability of account holders to access the system from a location of their choosing . . . ." (Brody Decl., at ¶ 131.)

Although Teligence has certainly set forth a plausible argument, this Court finds that Teligence has failed to meet its burden of proof on summary judgment. Teligence's argument does not simply combine two references. It adds a non-trivial feature that is not disclosed in either reference. Therefore, this Court finds that a reasonable jury could conclude that it would not have been obvious to selectively provide a cue depending on the associated telephone number signaling (*e.g.* ANI).[3]

Accordingly, this Court DENIES Teligence's motion for summary judgment as it relates to the issue of the validity of claim 24 of the '415 patent.

### 2. Claim 32 of the '309 Patent

Teligence also argues that claim 32 of the '309 patent is invalid as obvious in view of a combination of U.S. Patent No. 4,531,023 entitled "Computer Security System for a Time Shared Computer Accessed Over Telephone Lines" ("Levine") and U.S. Patent No. 3,525,811 entitled "Remote Control Voting System" ("Trice").

#### a. The References

##### i. Levine

Levine describes a system and method for securely connecting remote computers to a time-shared central computer. A user connects to the time-shared central computer by means of a modem connected to the telephone system. The user's calling number (ANI) is transmitted, by a dedicated line, to an offsite security computer system. The user will then enter his password. The password will allow the system to bring up the user's profile including the user's calling number. This calling number will be compared to the calling number registered in the offsite security computer system.

##### ii. Trice

Trice describes a system and a method for connecting remote voters to a polling place via a telephonic system. After connecting to the system, the system provides a code number to the call, and a reproducer instructs the caller with audio signals on how to proceed. The caller must input his voter registration number using Touch-Tone or other means. An information retrieval system searches for the voter's record. If no record is found, the voter is excluded from voting and may be told to call voter assistance. If the record is found and the voter has not yet voted, he is asked to enter his secret code number to

---

**3.** This Court notes that Katz also argues that the prior art discloses only playing a message not a "cue." The Court does not reach this issue.

match the one in the record. If a match occurs, the voter is further instructed to transmit a voice communication for voice print identification. If the voice prints match, the caller may proceed with voting.

### b. Motivation to Combine

■ As a threshold matter, we look at whether there is a motivation to combine these two references. Although Teligence's brief does not address the issue, its expert argues that a person of ordinary skill in the art would be motivated to combine Levine and Trice because such a combination would have yielded predictable results and because they both disclose the importance of verifying a caller's identity before allowing them to access the system. (Prieve Report at ¶¶ 678–679.) Teligence also notes that Levine identified Trice as prior art.

In contrast, Katz's expert, Dr. Brody, raises a number of reasons why a person of ordinary skill in the art would not be motivated to combine the two references: (1) the systems are entirely disparate (Brody Decl. at ¶ 147); (2) Trice teaches away from using ANI (*id.* at ¶ 148); (3) using ANI in the Trice system would unduly restrict a voter to voting only in one place (*id.* at ¶ 149); (4) a caller in Trice is already subject to three levels of security (*id.* at ¶ 150); (5) adding the use of ANI to Trice as suggested would increase costs (*id.* at ¶ 151); and (6) it would not be "predictable" to add the use of ANI to the Trice voting system. (*id.* at ¶ 152).

After reviewing the arguments, this Court finds that there is a factual issue with respect whether a person of ordinary skill in the art would be motivated to combine Levine and Trice. A reasonable jury could conclude that there is no such motivation because a system for connecting remote voters to a polling place and a system for allowing computers to communicate securely are so disparate. Moreover, Teligence's argument merely parrots the conclusions it seeks to have this Court adopt. Accordingly, this Court DENIES Teligence's motion for summary judgment as it relates to the issue of the validity of claim 32 of the '309 patent.

## C. Invalidity, Indefiniteness

### 1. Legal Standard

Teligence argues that several claims are invalid as indefinite under 35 U.S.C. § 112 ¶ 1 which states:

> The specification shall contain a *written description* of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same . . . .

(emphasis added).

The written description requirement helps to ensure that the patent applicant actually invented the claimed subject matter. *See Vas–Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1561 (Fed.Cir.1991) ("Adequate description of the invention guards against the inventor's overreaching by insisting that he recount his invention in such detail that his future claims can be determined to be encompassed within his original creation.")

Whether a patent complies with the written description requirement is a question of fact. *Pandrol USA, LP v. Airboss Ry. Products, Inc.*, 424 F.3d 1161, 1164 (Fed.Cir.2005). Here, defendants have moved for summary judgment arguing that numerous claims are invalid because they fail to comply with the written description requirement. Summary judgment is appropriate only if no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Fed.R.Civ.P. 56(c).

This Court must "view [ ] the evidence and any disputed factual issues in the light most favorable" to the plaintiff. *Enzo Biochem Inc. v. Gen–Probe, Inc.,* 323 F.3d 956, 962 (Fed.Cir.2002) (citation omitted).

### 2. Qualification Structure

■■■ Teligence argues that the "qualification structure" in claim 32 and 46 of the '309 patent and claim 24 of the '707 patent is indefinite under *WMS Gaming.* The parties agree that the qualification structure is a means plus function limitation governed by § 112 ¶ 6. They also agree that the structure corresponding to the recited function is the "qualification unit 93."

However, Teligence argues that the qualification unit is a general purpose computer or processor that would require the structure to include an algorithm. *WMS Gaming,* 184 F.3d at 1349. Teligence then argues that there is no such algorithm and concludes that the claims are invalid as indefinite. In response, Katz argues that the qualification unit 93 is a specialized component. Therefore, Katz concludes that *WMS Gaming* does not apply and the specification does not need to disclose an algorithm.

In this Court's October 13, 2009 Order Denying Defendants' Joint Motion for Invalidity Under § 112 (DE 6820), 2009 WL 8636052, this Court found that the qualification unit 93 unit is not a general purpose computer or microprocessor itself. *Id.* at pp. 19–20. Teligence merely repeats the same arguments regarding the "qualification unit," albeit for different claims and patents. However, the analysis is the same. In contrast to a component like the processing unit 92, the '309 and '707 patents do not characterize the qualification unit 93 as a general purpose computer. Rather, the patents discuss the specific functions that the qualification unit performs. (*See* Brody Decl. at ¶ 187.) Teli-

gence has raised no new arguments that cause the Court to revisit its earlier decision. Thus, the Court concludes that an algorithm is not part of the claim construction of the qualification structure limitation. Accordingly, this Court DENIES defendants' motion for summary judgment of indefiniteness as it relates to whether there is a written description for the "qualification structure" in claims 32 and 46 of the '309 patent and claim 24 of the '707 patent.

### 3. "Consumable Participation Key"

Claim 46 of the '309 patent and claim 24 of the '707 patent require a "consumable participation key." Although Teligence acknowledges that the specifications of both patents mention a "consumable key," it argues that the disclosure is inadequate because they do not explain how the key is "specified, manipulated, or, most importantly, used to restrict the extent of access to the system." (Teligence's Mot. for Summ. J. at p. 31.)

■■■ The written description requirement is satisfied if a person of ordinary skill in the art reading the patent application as originally filed would recognize that the patent application described the invention as finally claimed in the patent. It is unnecessary to spell out every detail of the invention in the specification; only enough must be included to convince a person of ordinary skill in the art that the inventor possessed the full scope of the invention. *Union Oil Co. of Cal. v. Atl. Richfield Co.,* 208 F.3d 989, 997 (Fed.Cir. 2000).

■■■ Citing to its expert, Dr. Forys, Teligence implies that a person of ordinary skill in the art would not understand how to construct the claimed invention. However, a review of the relevant portions of the expert report fails to show that Dr. Forys even addresses this issue. (Forys

Expert Report at ¶¶ 124–127 and 129 attached as Ex. 29 to Caridis Decl.) Moreover, Katz's expert, Dr. Brody, identifies common portions of the specifications that describe the consumable participation key, including description of caller-entered data signals specifying the key and that the key is for restricting the extent of access to the system. (Brody Decl. at ¶¶ 196, 198.) Dr. Brody then goes on to identify other passages that provide further details regarding participation keys. (Brody Decl. at ¶¶ 199–204.)

This Court finds that Dr. Brody's declaration, together with the cited passages from the specification, provide sufficient evidence to create a triable issue of fact. Accordingly, this Court DENIES defendants' motion for summary judgment of indefiniteness as it relates to whether there is a written description for the "consumable participation key" limitation in claim 46 of the '309 patent and claim 24 of the '707 patent.

## D. Laches

Teligence also moves for summary judgment asking the Court to rule that laches applies.

### 1. Legal Standard

■■■■■ Laches occurs when a plaintiff unreasonably delays in bringing suit on its patent. The defense bars a patentee from recovering damages accrued prior to the filing of lawsuit. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1041 (Fed.Cir.1992) (*en banc*). The elements of laches are: "(1) the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant, and (2) the delay operated to the prejudice or injury of the defendant." *Aukerman*, 960 F.2d at 1032. Laches must be established by a preponderance of the evidence. *Id.* at 1045.

### 2. Unreasonable Delay

■■■■■ Teligence argues that Katz had knowledge of Teligence's activities since 1999 and did not sue Teligence until eight years later—in June 2007. There is a rebuttable presumption that laches applies if the delay in bringing a lawsuit is over six years. *Id.* at 1035. The plaintiff can puncture the presumption with introduction of evidence sufficient to raise a genuine dispute as to either delay or prejudice. *Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290, 1293 (Fed.Cir.1992). Courts have recognized both litigation and negotiations with the accused as an excuse for delay. *Aukerman*, 960 F.2d at 1033 (citations omitted). Once the presumption is burst, the defendant must affirmatively prove both elements of laches. *Hemstreet*, 972 F.2d at 1293 (citing to *Aukerman*, 960 F.2d at 1032).

First, this Court must determine if the presumption of laches applies. Katz filed the current lawsuit on June 8, 2007. Teligence attempts to establish Katz's first knowledge in three ways. First, Teligence argues that Katz had actual knowledge of potentially infringing activities of Teligence's predecessor, Boulevard Media, Inc. ("Boulevard") by March 1999, when Boulevard was identified as a potential sublicensee during Katz's negotiations with MicroVoice Applications, Inc. However, the evidence Teligence identifies is merely a list of MicroVoice Re–I.D. customers attached to the MicroVoice license. Although this evidence *may* suggest that Katz should have investigated Boulevard, it certainly does not show that Katz had knowledge of Boulevard's potentially infringing activity and it is clearly insufficient to satisfy Teligence's burden of proof on summary judgment.

Second, Teligence argues that Katz had constructive knowledge of Teligence's activities because Boulevard's activities were

open and notorious. Although Teligence argues that very public activity is sufficient to place a patent holder on notice under *Wanlass v. General Electric Co.,* 148 F.3d 1334 (Fed.Cir.1998), that decision states that a "plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, *provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry." Id.* at 1338 (citation omitted, emphasis added). Thus, if Katz had known of the public activity that Teligence identifies, that may be sufficient to show constructive knowledge. Here, Teligence fails to make that showing. Thus, this Court cannot find any constructive knowledge.

Third, Teligence argues that the knowledge of Mr. Miller, MicroVoice's CEO, should be attributed to Katz because MicroVoice's rights to grant sublicenses created a principal-agent relationship between Katz and MicroVoice. Agency is actual when the agent is really employed by the principal. Cal. Civil Code §§ 2298 and 2299. An agency is ostensible when the principal intentionally or by want of ordinary care causes a third person to believe another is the principal's agent, who is not really employed by the principal. § 2300.

Katz argues that MicroVoice was not an actual agent because the Katz/MicroVoice license specifically states that MicroVoice is not an agent and because Mr. Miller was not employed by Katz. Katz argues that MicroVoice was not an ostensible agent because Mr. Miller had actually acted on behalf of Teligence. He was retained as a consultant to negotiate with Katz and he asserted arguments on behalf of Teligence. In reviewing the briefs, this Court finds that although Teligence presented evidence suggesting that MicroVoice was an agent, it has failed to satisfy its burden of proof on summary judgment. Therefore, for the purposes of this summary judgment motion, this Court will not attribute Mr. Miller's knowledge to Katz.

This Court has rejected all of Teligence's arguments regarding first knowledge. Instead this Court draws the inferences against Teligence and assumes that Katz did not know of Teligence's potentially infringing activity until August 2001, when Katz first contacted Teligence. Relying on this date, the presumption of laches does not apply. Since Teligence's motion failed to identify any other evidence of unreasonable delay, this Court does not find unreasonable delay.

Moreover, Katz says that any delay was excused by its negotiations with Teligence and various third parties. In response, Teligence argues that licensing efforts with third parties do not excuse delay where the patentee failed to notify the potential infringer. Teligence's response fails to address Katz's negotiations with Teligence.[4] Early laches decisions state that, for license negotiations to serve as an excuse, the negotiation must "ordinarily be continuous and bilaterally progressing, with a fair chance of success, so as to justify significant delays." *A.C. Aukerman Co. v. Miller Formless Co., Inc.,* 693 F.2d 697, 700 (7th Cir.1982); *see also Continental Coatings Corp. v. Metco, Inc.,* 464 F.2d 1375, 1377–78 (7th Cir.1972). Here, Teligence has failed to present evidence that show that its negotiations failed to meet this standard. Accordingly, this Court finds that there is a triable issue with respect to unexcusable delay both based on the length of delay and on the excuses Katz identified.

---

**4.** Moreover, this Court rejects Teligence's notice argument. Both *Hemstreet,* 972 F.2d at 1293 and *Aukerman,* 960 F.2d at 1039, make it clear that "the equities may or may not require that the plaintiff communicate its reasons for delay to the defendant."

### 3. Prejudice

The second element of laches is prejudice. Teligence argues that it suffered both economic and evidentiary prejudice based on Katz's delay in filing suit. With respect to economic prejudice, Teligence argues that its predecessor, Boulevard, could have changed its operations substantially had Katz approached Boulevard in 1999 to negotiate a license. In support of that argument, Teligence relies on a single declaration. (Madigan Decl. at ¶ 23.)

In response, Katz argues that Teligence has failed to show that it would have acted differently if Katz had sued earlier. In *Meyers v. Brooks Shoe, Inc.*, 912 F.2d 1459, 1463 n. 1 (Fed.Cir.1990), the Federal Circuit stated that to prevail on laches, the defendants "must show that the prejudice they suffered resulted from the delay." In *Meyers*, none of the defendants submitted evidence that they curtailed design and development of the accused products in response to suit once it was actually filed. *Id.* at 1463. The evidence also failed to show that the defendants were concerned that their products might infringe the patents or that they would have acted differently had they been sued earlier. *Id.* As a result, the Federal Circuit reversed the district court's decision to grant the defendants' summary judgment on laches. Here, the Madigan Declaration only suggests that Teligence could have acted differently. It hardly proves that Teligence would have acted differently. Accordingly, this Court finds that Teligence has failed to prove economic prejudice.

Teligence also argues that it suffered evidentiary prejudice. Teligence says that the memories of the relevant witnesses have faded and that there are missing relevant documents. Specifically, Teligence says that many of Boulevard's financial documents prior to 2003 have been lost. In response, Katz argues that the defendants have failed to identify any specific item of absent evidence or testimony that prevents it from presenting a full defense.

Although Teligence generally discusses evidence that is no longer available, it never explains why this evidence is important to its case, or discusses why the same facts cannot be otherwise proved. As a result, this Court finds that Teligence has failed to present substantial evidence of evidentiary prejudice.

In sum, this Court has found factual issues with respect to unreasonable delay, excuse, and economic and evidentiary prejudice. Accordingly, this Court DENIES Teligence's motion for summary judgment as it relates to the affirmative defense of laches.

### IV. KATZ'S CROSS MOTION FOR SUMMARY JUDGMENT

Katz's motion for summary judgment asks this Court to rule against Teligence's affirmative defenses of equitable estoppel and prosecution laches.

### A. Equitable Estoppel

Equitable estoppel comes into play when a patent owner represents to an infringer, expressly or implicitly, that he will not enforce his patent against the infringer's business, and the infringer relies on that representation. The Federal Circuit has stated that there are three elements to equitable estoppel: a) the patentee, through misleading conduct, leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer; b) the alleged infringer relies on that conduct; and c) due to its reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim. *See A.C. Aukerman*, 960 F.2d at 1028. Equitable estoppel must be shown by a preponderance of the evidence. *Id.* at 1046.

### 1. Misleading Conduct

 Katz argues that Teligence has no evidence to show misleading conduct. In response, Teligence discusses what Katz knew and should have known, but it never identifies any misleading conduct apart from Katz's silence. However, silence cannot be the basis for an inequitable conduct claim. *See Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290, 1295 (Fed.Cir.1992) ("equitable estoppel may, in some instances, be based upon a misleading silence, mere silence must be accompanied by some other factor which indicates that the silence was sufficiently misleading as to amount to bad faith." (internal citations omitted)); *see also ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1064 (Fed.Cir.1995) ("Misleading action by the patentee may be silence, if such silence is accompanied by some other factor indicating that the silence was sufficiently misleading to amount to bad faith."); *Aukerman*, 960 F.2d at 1042 ("inaction must be combined with other facts").

Since Teligence has failed to offer any substantial evidence of misleading conduct, this Court GRANTS Katz's motion for summary judgment with respect to Teligence's equitable estoppel defense.[5]

### B. Prosecution Laches

 Katz's summary judgment motion asks this Court to dismiss Teligence's affirmative defense of prosecution laches. The equitable doctrine of prosecution laches may bar enforcement of patent claims issuing after an unreasonable and unexplained delay in prosecution, even though the applicant complied with pertinent statutes and rules. *Symbol Techs., Inc. v. Lemelson Med., Educ., & Research Found.*, 277 F.3d 1361, 1363 (Fed.Cir.2002) (hereinafter "*Symbol I* ").

### 1. Legal Standard—Prosecution Laches

In *Symbol I*, the Federal Circuit did not issue any "firm guidelines" for determining when laches exists. *Symbol Techs., Inc. v. Lemelson Med., Educ., & Research Found.*, 422 F.3d 1378, 1385 (Fed.Cir.2005) (hereinafter "*Symbol II* "). Both parties agree that prosecution laches requires an unreasonable and unexplained delay in the prosecution of a patent. Unlike some of the other cases in this multidistrict litigation, Teligence does not argue that intervening rights is not necessary to prove prosecution laches. Thus, the defendant must prove both: 1) unreasonable and unexplained delay, and 2) intervening adverse rights. Katz's motion for summary judgment argues that Teligence has failed to present substantial evidence to support either of these elements.

### 2. Intervening Rights

 On July 2, 2009, this Court struck Teligence's intervening rights contentions as tardy. (DE 6625). The Court later DENIED Teligence's request to reconsider that order on October 13, 2009, 2009 WL 8635998 (DE 6818). In view of that order, Teligence has no evidence to support this element of its defense. Accordingly, this Court GRANTS Katz's motion for summary judgment as it relates to the prosecution laches defense.

### 3. Unreasonable Delay

Even though the intervening adverse rights ruling disposes of Teligence's prosecution laches defense, this Court will also address the unreasonable delay argument. This will allow the parties to include this issue in any appeal.

---

5. In two short paragraphs, Katz's motion also raises the issues of reliance and prejudice. Since a decision on those issues is unnecessary, this Court does not reach them.

Katz's summary judgment motion argues that Teligence does not have evidence of unreasonable delay. However, Teligence offers the expert report of Professor Wagner that compares the pendency of Katz's patents against other patents prosecuted during the same time period. With respect to the patents Katz asserts against Teligence, the report shows thirteen of the asserted claims have priority pendencies that were longer than 99% of other similar patents. These delays are certainly significant and might provide a basis for finding prosecution laches.

The question revolves on whether Katz can provide a reasonable explanation for that delay. Katz's motion argues that it was diligent and hastened the issue of patents by having at least one patent issue between 1988 and 2004. Moreover, Katz points out that it filed terminal disclaimers in connection with nearly all of its patents. *See Chiron Corp. v. Genentech, Inc.,* 268 F.Supp.2d 1139, 1143 (E.D.Cal.2002) (filing of a terminal disclaimer "may weigh strongly in favor of finding the delay is reasonable"). However, Teligence challenges the reasonableness of Katz's explanations. (*See* Mossinghoff Report at ¶¶ 145–155.) With all of the evidence in mind, this Court finds that there is a genuine issue of material fact with respect to the issue of unreasonable and unexplained delay. Accordingly, this Court DENIES Katz's motion for summary judgment on the issue of prosecution laches to the extent it relies on unreasonable delay.

## V. SUMMARY

### A. Teligence's Motion for Summary Judgment

#### 1. Non–Infringement
##### a. Claim 11 of the '150 Patent

This Court DENIES Teligence's motion for summary judgment of non-infringe-ment with respect to the "conditionally interfacing" limitation because preliminary qualification steps can satisfy the "conditionally interfacing" limitation.

This Court also rejects Teligence's narrow construction of the "fetching control data" limitation and DENIES Teligence's motion for summary judgment of non-infringement with respect to this limitation.

##### b. Claim 1 of the '285 Patent

This Court DENIES Teligence's motion for summary judgment of non-infringe-ment with respect to the "imposed condition" limitation because preliminary qualification steps can satisfy the "imposed condition" limitation.

This Court also rejects Teligence's attempt to interpret "or one of said live operator stations" as a format and DENIES Teligence's motion for summary judgment of non-infringement with respect to this limitation.

This Court also finds that the rule from *WMS Gaming* does not apply to the "selection means" and "interconnect switch means." Therefore, the Court DENIES Teligence's motion for summary judgment of non-infringement with respect to those limitations.

##### c. Claim 32 of the '309 Patent

This Court finds that the "designation structure" is not governed by 35 U.S.C. 112 ¶ 6. Therefore, the Court DENIES Teligence's motion for summary judgment of non-infringement with respect to this limitation.

##### d. Claim 46 of the '309 Patent and Claim 24 of the '707 Patent

This Court finds that "caller data signals" refers to signals containing data related to a caller. Therefore, the Court DENIES Teligence's motion for summary judgment of non-infringement with respect to this limitation.

This Court finds that there is factual issue with respect to whether a promotional membership number can be considered a "consumable participation key." Therefore, the Court DENIES Teligence's motion for summary judgment of non-infringement with respect to this limitation.

This Court finds that Teligence has failed to substantially address Katz's infringement allegation related to the "at a predetermined time" limitation (claim 24 of the '707 patent only). Therefore, the Court DENIES Teligence's motion for summary judgment of non-infringement with respect to this limitation.

### e. Claim 183 of the '863 Patent

This Court rejects Teligence's attempt to interpret "key numbers" to require incrementing or decrementing. Therefore, this Court DENIES Teligence's motion for summary judgment of non-infringement with respect to this limitation.

This Court also rejects Teligence's attempt to limit "processing at least certain answer data responsive to said approval signals" to the "key numbers" to a particular manner of manipulating the answers of individual callers described by the specification. Therefore, this Court DENIES Teligence's motion for summary judgment of non-infringement with respect to this limitation.

### f. Claims 32, 53 and 67 of the '762 Patent

This Court finds that there is a factual issue with respect to whether a membership number can be considered a "customer number." Therefore, the Court DENIES Teligence's motion for summary judgment of non-infringement with respect to this limitation.

However, this Court finds that the claims require a separate "customer number" and "acknowledgment number." Therefore, this Court GRANTS Teligence's motion for summary judgment of non-infringement with respect to claims 32, 53 and 67 of the '762 Patent.

### g. Claim 24 of the '415 Patent

This Court finds that "associated telephone number signals" can refer either ANI or DNIS signals. Therefore, the Court DENIES Teligence's motion for summary judgment of non-infringement with respect to this limitation.

This Court finds that the term "cues" is not limited to a game format. Therefore, the Court DENIES Teligence's motion for summary judgment of non-infringement with respect to this limitation.

This Court finds that the term "on-going accounting data" is not limited to points a caller accumulated during a call. Therefore, the Court DENIES Teligence's motion for summary judgment of non-infringement with respect to this limitation.

### h. Doctrine of Equivalents

This Court finds that Teligence has failed to satisfy its burden of proof with respect to any arguments it raised with respect to infringement under the doctrine of equivalents. Therefore, this Court DENIES its motion for summary judgment with respect to this issue.

### 2. Invalidity, Obviousness

This Court finds that a reasonable jury could conclude that a combination of First Hawaiian and Friedes did not render all the limitations of claim 24 of the '415 patent obvious. Therefore, this Court DENIES Teligence's motion for summary judgment with respect to this defense.

This Court finds that there is a factual issue with respect to whether there is a motivation to combine the Levine and Trice references. Therefore, this Court DENIES Teligence's motion for summary judgment with respect to the issue of whether claim 32 of the '309 patent was obvious.

### 3. Invalidity, Indefiniteness

This Court finds that the qualification unit 93 is not a general purpose computer and that the *WMS Gaming* rule does not apply to the qualification structure of claims 32 and 46 of the '309 patent and claim 24 of the '707 patents. Therefore, this Court DENIES Teligence's motion for summary judgment of indefiniteness as it relates to these issues.

This Court finds that there is sufficient written description of the "consumable participation key" in the specifications of the '309 and '707 patent. Therefore, this Court DENIES Teligence's motion for summary judgment of indefiniteness as it relates to claim 46 of the '409 patent and claim 24 of the '707 patent.

### 4. Laches

This Court finds that there are factual issues with respect to unreasonable delay, excuse, and prejudice. Therefore, this Court DENIES Teligence's motion for summary judgment as it relates to its laches affirmative defense.

### B. Katz's Motion for Summary Judgment

### 1. Inequitable Conduct

This Court finds that Teligence has failed to offer any substantial evidence of misleading conduct apart from silence. This Court GRANTS Katz's motion for summary judgment on Teligence's affirmative defense of inequitable conduct.

### 2. Prosecution Laches

Since Teligence has failed to offer any evidence of intervening rights (that has not been stricken), this Court GRANTS Katz's motion for summary judgment on Teligence's affirmative defense of prosecution laches. The Court DENIES Katz's motion to the extent that it argues that there is no factual issue with respect to unreasonable delay.

To the extent the Court has relied on evidence to which the parties have objected, those objections are overruled.

**IT IS SO ORDERED.**